KRAUSS et al. v. JOS. R. PEEBLES' SONS CO. et al.

(Circuit Court, S. D. Ohio, W. D. September 15, 1893.)

No. 4,621.

**1. Trade-Marks—Infringement—Injunction—Pleading—Parties.**
Where a distiller granted the sole and exclusive control of his bottle product for five years, and agreed not to permit others to use his trade labels, a bill by the grantee to enjoin infringement of the trade-marks was defective which failed to make the distiller a complainant, or state a reason for not doing so.

**2. Same—Sale in Bulk—Resale in Bottles.**
The sale of whisky in bulk under a trade-mark by a distiller does not justify the vendee in bottling for retail, and in using on the bottles the trade label which the distiller uses on smaller bottles of the same brand of whisky when prepared by himself for the retail trade.

**3. Equitable Relief—When Refused—Fraud.**
Where a distiller mixes 35 per cent. of other whiskies, bought for the purpose, with his own brand of whisky, and sells the mixture under his trade label, with cautions to avoid imitations, and to the effect that the mixture was "bottled at the distillery warehouse, and is warranted perfectly pure and unadulterated," a court of equity will not protect the distiller or his privies in contract from infringement of the trade-mark thus fraudulently used.

In Equity. Suit by Otto A. Krauss and Krauss, Hart, Felbel & Co. against the Jos. R. Peebles' Sons Company and Jos. S. Peebles to restrain infringement of trade-mark. On motion for a preliminary injunction. Denied.

Statement by TAFT, Circuit Judge:

This is a motion for a preliminary injunction. Jurisdiction existed by reason of the diverse citizenship of the parties, the defendants being citizens and residents of Ohio, Krauss a citizen of New York, and Krauss, Hart, Felbel & Co. a corporation organized under the laws of West Virginia. The complainants in their bill sought to restrain the defendants from selling bottled whisky under a trade-mark and in a style of bottling alleged to have been originated and to be owned by Jas. E. Pepper & Co., a firm engaged in distilling and bottling whisky at Lexington, Ky. The interest of the complainants in the subject-matter and their right to bring the action was claimed to arise under a contract set forth in the bill, made on January 22, 1892, by Otto A. Krauss and Jas. E. Pepper & Co., in which Krauss agreed, among other things, to purchase at a fixed price from Pepper & Co. 30,000 cases of bottled whisky a year, in equal monthly installments, and as much more as required, on condition that Pepper & Co. should furnish the same promptly, and keep the whisky up to its then standard of quality, and should sell bottled whisky to no one else except to a firm in San Francisco, and should give Krauss "the entire control of the trade of said bottled whisky [then] now existing, or which may [might] accrue during the term of this contract, and any renewal thereof."

The contract contained stipulations as to payment, credit, etc., not important here. Pepper & Co. further agreed to bill all their bottled whisky to Krauss, who obligated himself to fill existing contracts of Pepper & Co. with Peebles' Sons Co., and Meyer & Co., of Cincinnati. The contract continued: "Party of the first part (Pepper & Co.) further obligates himself not to furnish to any person any labels now used, except that they may furnish to the Jos. R. Peebles' Sons Co. such labels as they are now using with the firm name of Jos. R. Peebles' Sons Co. on the same. The said party of the first part further agrees to furnish proper desk room to the party of the second part at their distillery or office for the use of agent for the party of second part, their agency books, and all the facilities that are now enjoyed by party of the first part for cartage and general purposes, free of cost to the party of the second part. The party of the first part agrees to furnish, free of cost, to the party of the second part, all glass and other signs that in the judgment of the party of the first part may be needed for the proper advertising of goods. Party of the first part further agrees that in case of the death of Jas. E. Pepper that it shall be so arranged that the executors of his estate shall be empowered to carry out the provisions of this contract with the party of the second part, and, in case of the sale of the said distillery of the party of the first part, such sale shall be made subject to the provisions of this contract, and with the obligations upon the part of the purchaser to comply with the terms of this contract. Party of the first part further agrees to neither bottle or cause to be bottled whisky under any brand or label except the Old Pepper whisky brand or label, of which whisky so labeled the party of the second part has entire control as hereinbefore set forth."

Krauss further agreed to purchase from Pepper & Co. 1,000 barrels of bourbon and 500 barrels of rye in bulk each year of the contract, at the option of Pepper & Co. It was further stipulated that when this contract was signed all existing contracts except those before mentioned "relating to the sale and delivery of said whiskies bottled at" Pepper's distillery should cease. The contract became immediately operative, except as to amount of whisky to be delivered and received, which term was to come, into full force March 1, 1893.

The bill avers that Krauss, with the knowledge and approval of Pepper & Co., conveyed all his rights under the contract to his co-complainants, Krauss, Hart, Felbel & Co., the West Virginia corporation before mentioned. The bill further alleges that since the year 1886, and prior thereto, Pepper & Co. had been continuously engaged in manufacturing, selling, and dealing in hand-made sour mash Kentucky whisky near Lexington, Ky., and that during all said time they had been bottling large quantities of said whisky at their said distillery, and putting the same on the market in cases of a dozen bottles of the character hereafter described; that they had at great expense extensively advertised the same, so that the sales had grown to

more than 2,500 cases monthly, and that complainants had also spent large sums in further advertisement of the same. The bill proceeds: "Your orators further show that said whisky so bottled and sold as aforesaid was bottled in imported, seamless, white flint glass bottles of a very attractive character, of such size that each would hold one-fifth of a gallon, and that the same, on account of their sizes, became known to the trade as 'Fives,' and that these bottles were labeled with the following device and trade-mark, which the said firm of Jas. E. Pepper & Co. adopted in the year 1880 to indicate the origin and quality of said whisky, and that it had been bottled by the said Jas. E. Pepper & Co. at their distillery near Lexington, Ky., to wit." There is then pasted in the bill a gold label, with words and figures printed thereon, as follows:

The label is gilt, the letters are white, some with black shading, and the shield or trade-mark proper is red. The bill, after describing the foregoing, states that during the year 1893 Pepper & Co. had added a cautionary mark to the top of the label against refilling the bottle without destroying the label and had inserted in the red shield the words "Established 1780."

The bill proceeds: "Your orators further show that for the purpose of further identifying and distinguishing their whisky so bottled at their distillery as aforesaid said firm of Jas. E. Pepper & Co. pasted diagonally across the back of each of the bottles so labeled as aforesaid a paper slip, on which was printed in black letters the following: 'This whisky is distilled under the same formula and process used by the grandfather and father of our Mr. Jas. E. Pepper more than one hundred years ago. Bottled at the distillery warehouse, and warranted perfectly pure and unadulterated.' Below the lines so printed as aforesaid in black was printed on said slips the following in red color: 'Genuine only when bearing our unbroken facsimile signature across the stopper. Consumers should see that the signature is unbroken, otherwise this bottle may be filled with inferior spirits.' Over the lines so printed in red color was imprinted the chirographical [sic] of said firm, 'Jas. E. Pepper & Co.' In addition to the foregoing, and for the purpose of further marking and identifying the goods of the said Jas. E. Pepper so bottled as aforesaid at their distillery,

there was pasted over the cork or stopper of each of said bottles a paper slip or label, with parallel red lines on either side, which extended down upon two sides of the neck of said bottles, on which, between the red lines, was the chirographical [sic] of said firm, 'Jas. E. Pepper & Co.;' that, in addition to the foregoing, and for the purpose of further marking and identifying the goods of the said Jas. E. Pepper & Co. as bottled at their said distillery near Lexington, Ky., there was imprinted upon the cork of each of said bottles the words, 'Jas. E. Pepper & Co., Distillers, Lexington, Ky.,' so placed as to be seen and read through the glass neck of said bottles. They further show that the said bottled whisky is known to the public and to buyers and dealers as 'Old Pepper Whisky,' and is represented and identified as such and as bottled at the distillery by the aforesaid trade-marks, devices, and labels." After averring that by reason of the popularity of the whisky and the extensive advertisement thereof by Pepper & Co. and complainants, it has acquired a wide reputation and extensive sale, making the trade-marks of great value, the bill alleged that before the Krauss contract, Peebles' Sons Company, defendant, had purchased large quantities of whisky made by Pepper & Co., and had bottled portions of it, but only in quart bottles and flasks, and never in bottles containing one-fifth of a gallon, and that on such quarts and flasks the Peebles Company had been allowed by Pepper & Co. to use the gold label above described, but that it had never been allowed to use any of the other imprints, marks, and devices described; that such use of the gold label had been permitted by Pepper & Co. only as an accommodation, without compensation, and with no obligation on Pepper & Co. to continue such permission; that the Peebles Company had never been permitted to use the label on "fives," or with the other marks and the style of bottling adopted by Pepper & Co., to show that the whisky had been bottled at the distillery.

The bill then sets out at length a contract made by the Peebles Company with Krauss, Hart, Felbel & Co., in which the Peebles Company is given the exclusive right to sell the distillery-bottled goods of Pepper & Co. within a certain territory, including Cincinnati and vicinity, and stipulates to maintain a certain price upon them. The bill charges that the Peebles Company violated this contract by selling such bottled goods outside of the agreed territory. The bill further charges that the Peebles Company, knowing complainants' right under the contract with Pepper & Co., and with the purpose of injuring their sole and exclusive rights to the use of the trade-mark upon whisky made and bottled by Pepper & Co., fraudulently put up whisky in bottles exactly like those used by Pepper & Co., and procured labels exactly like Pepper & Co.'s labels in every respect, including colors and arrangement, and are selling the same at prices less than those at which complainants can sell them; that the main label used by the Peebles Company is identical with that used by Pepper & Co., except that beneath it are the words "Our Specialty," printed over which, on the same line, are the words, "The Jos. R. Peebles' Sons Company;" that a caution label and a slip across the cork are used by the Peebles Company upon their bottles, arranged exactly as the caution labels and slips are upon the Pepper bottles, which, though they contain different printed matter, make the Peebles bottle so close an imitation of the Pepper bottle that only a close observer could detect the difference; and this is done for the purpose of misleading the public, consumers, and dealers into buying the Peebles bottles on the faith that they are the Pepper bottles, filled at the distillery, and that it has had this effect, to the damage of the complainants more than $25,000.

The complainants pray for a temporary, and, after a final hearing, a permanent, order of injunction restraining the Peebles Company from labeling any bottles containing whisky in the manner described, or in any manner similar to the labels and trade-marks of the said firm of Jas. E. Pepper & Co., or the combination thereof previously described, and for an accounting for bottles already sold.

Much evidence in the form of affidavits and exhibits was produced at the hearing in support and against the motion. From this, certain undisputed facts appeared. Jas. E. Pepper & Co. were a firm composed of James

E. Pepper and another which began to distill whisky at Lexington, Ky., in 1880. Until 1886 they did nothing but a distilling business, and sold their product in barrels, into the heads of which were burned the words, shield, trade-mark, and signature which were afterwards printed on the gold bottle label described in the bill. Before and after 1886 the defendants, who were large wholesale and retail grocers and liquor dealers of Cincinnati, purchased large quantities of Pepper whisky for ageing and bottling. Defendants bottled only in quart bottles and flasks. Before 1886 defendants used on their bottles a white label of their own, upon which were the words: "Old Pepper Whisky, Bottled by Peebles' Sons Co." In 1886 Pepper & Co. began to bottle their own whisky at Lexington, in the form described in the bill. They then adopted the gold label and the other distinguishing marks already referred to, and used only white flint seamless bottles, containing one-fifth of a gallon, or "Fives" as they are known to the trade. Bottles of this kind were well known to the trade, and had been used by other dealers.

The distillery bottling was undertaken rather to advertise the brand of Old Pepper whisky than to make a profit on the whisky sold thereby. This continued to be the purpose until 1890, as plainly appears from a letter of Pepper & Co. to the defendants, written in December, 1889. To further carry out this purpose, Pepper & Co. furnished to a number of dealers who bought their whisky in bulk the gold labels above described, to be placed upon bottles in which such dealers resold the whisky. In several cases a blank space was left at the bottom of the label upon which the name of the bottling firm was to be printed, with the words, "Our Specialty." Pepper & Co. encouraged Peebles' Sons Co. in pushing the bottling and the sale of the whisky by allowing them a certain amount of whisky to pay cost of advertising, and labels were furnished at the cost of Pepper & Co. to Peebles' Sons Co. down to the time of the Krauss contract and later. After 1890 the distillery bottling trade of Pepper & Co. grew to such proportions as to be very profitable. It does not appear that the defendants, or any of the other customers of Pepper & Co., ever bottled under the Pepper gold label in "fives" or with the other dressing of the bottle used on Pepper's distillery-bottled goods as described in the bill until March, 1893.

Up to that time, the Peebles Company considered that they had no right to bottle Old Pepper whisky, (i. e. bourbon,) under the gold label, in "fives." This clearly appears in a letter written by defendants to complainants in 1892. After March, 1893, however, defendants began to bottle in "fives" with the gold label and other dressing to be hereafter described. Pepper & Co. refused to furnish gold labels for this purpose, as formerly, and so defendants had them printed themselves. Defendants had on hand for several years as much as $40,000 worth of Pepper whisky in original barrel packages, and had this amount at the time of the filing of the bill herein. All this whisky had been bought by defendants directly from Pepper & Co., or from others with Pepper & Co.'s knowledge, and at their instance. Defendants, in addition to the bulk whisky which they bottled and sold, also had a contract with Pepper & Co. for the purchase and sale of the distillery-bottled "fives" within a described territory, and it was this contract which Pepper's contract with Krauss bound the latter to fulfill, and for which the subsequent contract between Krauss, Hart, Felbel & Co. and Peebles' Sons Co. was evidently a substitute. The defendants had so much whisky on hand that they wished to sell part of it to Krauss, Hart, Felbel & Co. after their contract with Pepper & Co. An agreement as to price could not be reached. The failure of complainants to buy this whisky, together, it may be, with other circumstances, caused defendants to feel a resentment both against complainants and Pepper & Co., and led their Joseph S. Peebles, November 24, 1892, to write a letter to T. C. Barnes, the agent of Pepper & Co. and of the complainants, in which, after declining to sell at a price offered, he said: "We are not very anxious to sell our whisky now. We have made arrangements to bottle every barrel of 1886 whisky. We think we are going to adopt Jas. E. Pepper & Co.'s style of bottling goods, so-called ten years old, and before we get through Jas. E. Pepper and Krauss, Hart, Felbel & Co. will wish they had bought our whisky. To-n, I am in for war. There is no use disguising the fact.

Do not feel as though I had been treated right in regard to Pepper whisky, and I propose to sell every gallon of Pepper whisky at a price that will make me more money and do us more good, and give Jas. E. Pepper the lick he deserves. You can send him this letter, if you want to."

In March of this year (1893) defendants began to bottle the whisky made and sold them by Pepper & Co. in "fives," with the gold label of Pepper & Co. on the bottle, and the words underneath it: "Our Specialty, The Joseph R. Peebles' Sons Co." This was the same label which they had theretofore used on their quart bottles and flasks. The "fives" bottles were white flint bottles like those of Pepper & Co. On the quart bottles defendants had used a cap, but now, on their "fives," a slip was pasted across the cork, resembling the slip used on Pepper & Co.'s bottles in colors and arrangement, on which was printed in black letters the following: "This bottle is guarantied to contain the genuine Jas. E. Pepper & Co. whisky, providing this label, which bears our facsimile signature, is unbroken." And across this legend appeared in red the facsimile signature, "The Joseph R. Peebles' Sons Co." In addition to this; diagonally across the back of the bottle, on the side opposite that on which the label appears, was a somewhat broader slip of paper, about the size of a similar slip on Pepper & Co.'s bottles, containing in black printing the following: "Owing to the fact that we are large holders of the famous Jas. E. Pepper & Co. matured whiskies, and in order to supply the constant and repeated demands for our bottling of said brand, we have decided to place before the trade and public Jas. E. Pepper whisky that we will guarantee old and pure. This whisky was purchased by us from Jas. E. Pepper & Co. at the time it was made, and is ripe and mellow, and we will: guarantee the contents of this bottle exactly as represented. Observe that our label over the cork bears our unbroken facsimile signature thus: 'The Joseph R. Peebles' Sons Co.'" In the center of this slip appears in a circle of red the white figures 1840, with the word "Trade" above and "Mark" below them. These figures in the red circle are the business trade-mark of the Peebles Company, to indicate the date the founder of the house, Joseph R. Peebles, began business. The defendants offered their Pepper whisky thus bottled in "fives" for sale all over the country at less prices than those at which complainants were selling the distillery bottled whisky in cases of "fives" before this competition began, and seriously interfered with complainants' sales.

It was developed upon the hearing by the defendants that up to and including most of the year 1891 Jas. E. Pepper & Co. bottled nothing in these cases of "fives" under the gold label but Old Pepper whisky made by themselves, but it was admitted that after November, 1891, the demand for the distillery bottling became so great that Pepper & Co. could not supply it with their own whisky, and so bought other brands of Kentucky bourbon whisky, said to be more expensive, older, and made by the same formula as their own, and blended these different brands with their own, and bottled the mixture under the same label and trade-mark. In December, 1891, 33 per cent. of other brands was used and blended. In January, 1892, the amount of other brands mixed reached 66 per cent. of the entire output; in February 65 per cent. In March all the whisky bottled was Pepper whisky. In April 57 per cent. of the output was not Pepper whisky; in May 17 per cent., in June 41 per cent., in July 31 per cent., and in August 31 per cent. In September no whisky seems to have been bottled. In October 37 per cent. of the output was not Pepper whisky, in November 15 per cent., in December 51 per cent., in January, 1893, 30 per cent., in February 40 per cent., and in March 39 per cent., in April 40 per cent., in May 40 per cent., and in June last 40 per cent. The figures show that for the last 18 months nearly 36 per cent of the whisky sold by Pepper & Co. in their distillery bottling has not been whisky made by them. It appears that the defendants became aware of this fact in the summer of 1892, but have dealt somewhat in the Pepper distillery bottling since that time.

William Lindsay, Bronston & Allen, and Foraker & Prior, for complainants.

Jones & James, for defendants.

TAFT, Circuit Judge, (after stating the facts.) For the sake of convenience and brevity, Krauss, Hart, Felbel & Co. will be referred to as Krauss, the Joseph R. Peebles' Sons Co. as Peebles, and Jas. E. Pepper & Co. as Pepper.

The first question is whether Krauss has the right to bring this action. Ordinarily the mere sale by the maker of an article of merchandise does not entitle the vendee to sue a third person for piracy of his vendor's trade mark. In the case at bar, Pepper has not assigned his trade-mark to Krauss, for he continues to make whisky, and to bottle it under his trade-mark, and to transfer, not his trade-mark, but the finished product bearing his trade-mark, to Krauss. Still it is manifest that the terms of the Pepper-Krauss contract are such that Krauss has a deep and substantial interest in preventing unlawful competition with Pepper's bottled whisky by the wrongful use of Pepper's trade-mark. Krauss is given sole and exclusive control of Pepper's bottle product for five years. Pepper agrees not to permit others to use his trade labels. Krauss could doubtless require Pepper to file a bill to protect his trade-mark, and, in the event of Pepper's refusal to do so, might file the bill himself. The defect in the bill as filed is that no reason is shown why Pepper was not made complainant. As this defect can be cured by amendment stating the reason, or by making Pepper a complainant, I shall pass to the merits of the case.

Peebles is placing upon bottles of whisky filled and offered for sale by him the trade label and trade-mark originated and used by Jas. E. Pepper & Co. This is not denied. The burden is on Peebles to show that he has a right to do so. His counsel contend that the right may be maintained,—First, on the ground that the whisky contained in the bottles is whisky made by Pepper & Co., and was sold to Peebles in barrels, upon which was Pepper's shield trade-mark; and, second, on the ground that Pepper gave Peebles the right to use the trade-mark and gold label by express contract. I do not think that Peebles' conduct, complained of in this case, can be justified on the first ground. It is doubtful whether the sale of merchandise in bulk under a trade-mark of the maker carries with it as incident thereto the right in the vendee to use the same trade-mark as a trade-mark on smaller and retail packages. It is true that the vendee cannot be prevented from stating the truth in reference to his wares, and that he may place upon his packages the statement that their contents were made by the real maker, and that they were sold by him under his trade-mark, but it seems to me it is a different thing for the vendee to use the trade-mark as such. Such use might be characterized as the use of the maker's sign manual to guaranty that the contents of the smaller packages are his manufacture, whereas the truth of that assertion depends wholly on the good faith of the vendee. However this may be, the complaint in the present case is not that Peebles uses the Pepper shield trade-mark alone, but that he uses the gold label containing the trade-mark,—a peculiar arrangement of colors, and other distinguishing marks. The gold label is not used on whisky barrels. It is peculiarly adapted to use upon bottles. It was for that pur-

pose that it was originated by Pepper and used by him. Now, it is manifest that the sale of merchandise in bulk by a manufacturer does not justify the vendee in using on his retail packages the label which the manufacturer uses upon the same merchandise only when prepared by himself on smaller packages for the retail trade.

Coming now to the second ground upon which Peebles' right in the premises is contended for, the question is one of fact. Pepper admits that from 1886 until the latter part of 1892 he permitted Peebles to use his bottle trade label known as the "gold label" on quart bottles and flasks filled and sold by Peebles, and that he furnished these labels to Peebles at his own expense. He says that he did so merely to accommodate Peebles, without consideration, and that he was under no obligation to continue the license to use the labels. I am clearly of the opinion that the circumstances under which permission to use the gold label was given to Peebles and continued for six years do create an obligation on Pepper's part to allow Peebles to use the gold label in the manner he has always used it, at least until Peebles shall have sold all the Pepper whisky which he bought on the faith of his being able to bottle and sell it under the gold label. The truth is the use by Peebles of the gold label was originally a favor to Pepper in advertising Pepper whisky. Pepper's letter of December, 1889, expressly states that he only bottled it himself to advertise his brand of whisky, and of course it would still further advertise his brand if his wholesale customers bottled and sold under the same brand. As a further evidence of this purpose, Pepper's allowance to Peebles of a certain amount of whisky in each consignment for advertising purposes is significant. On the faith of the use of the gold label, Peebles has bought Pepper whisky, and built up a trade of his own. It would, of course, be a pecuniary loss to him to be compelled to change his label and the appearance of his goods, the excellence of which have doubtless become associated in the mind of the buying public with this gold label and other marks used by him. But Peebles, in his correspondence, admits that his license to use the gold Pepper label upon his bottling of Pepper's bourbon whisky (and we have here to do only with bourbon whisky) was limited to quart bottles and flasks, and that it did not extend to "fives." This fully corroborates the contention of Pepper and Krauss that Pepper alone had the right to use the gold trade label on "fives," and that it was only used on bottles filled by Pepper at the distillery. As we have found that Peebles' right to use the gold label was based only on contract, the right would seem to be limited to the terms of that contract. It follows, then, that Peebles cannot justify his use of the gold trade label on his bottling of Pepper whisky in "fives," either on a contract implied from the purchase of the Pepper whisky or an express irrevocable license.

Counsel for defendants contend that, even if Peebles cannot show a right, expressly or impliedly conferred by Pepper, to use the gold label on "fives," Pepper cannot get any relief—First, because what he seeks protection for is not and cannot constitute a trademark in law; and, second, because the trade label and caution

notices which he uses on his bottles contain false representations of material facts calculated to deceive the public.

The right upon which a claim for relief must be based in this case is a very narrow one. It is not the exclusive right to use a trade-mark and trade label generally, but only the exclusive right to use them on a bottle of a certain size and quality, and with a certain arrangement of caution and other notices. Neither the size nor quality of the bottles is peculiar to claimants, nor could it be. Nor does the general arrangement of caution notices seem to have been new with the claimants. It is well settled that one cannot assert a trade-mark right in a peculiar form of package, or in a particular size or quality of covering. After plaintiffs' exclusive right to that which constitutes a lawful trade-mark is established, then the similarity in the size, form, and manner of packing plaintiffs' and defendants' goods is a circumstance of great significance in determining whether defendant intends to mislead and has misled the public into taking his goods as the plaintiffs'. But the size, form, and manner of packing are not a part of trade-mark property. I am very doubtful, therefore, whether Pepper has not, as a matter of law, by allowing other bottlers of his whisky to use his gold label, to indicate only that the contents are Pepper whisky, on their bottles, lost the exclusive right to use his trade label upon "fives" to indicate particular bottling. It is not necessary, however, to definitely decide the question of law just discussed, for the reason that, whatever the correct answer, there is a ground upon which all equitable relief must be refused to complainants, and the motion for the preliminary injunction must be denied.

The one important and prominent idea which the gold label and the caution notices upon the Pepper bottles are intended to make clear to the public is that the bottles contain whisky distilled by Jas. E. Pepper & Co., unmixed with any other whisky. The trade-mark of the shield is one which for more than 10 years has been placed on whisky barrels containing nothing but whisky distilled by Jas. E. Pepper & Co. The whisky had come to be known as "Old Pepper Whisky." The words "Old Pepper Whisky," placed upon a bottle, are an express statement that the bottle contains "Old Pepper Whisky." The shield trade-mark, and the words which accompany it, were obviously first adopted for use upon barrel packages of Old Pepper whisky; but to place such a trade-mark upon a bottle is to say to the purchaser that the contents were drawn from such barrels. "Consumers should satisfy themselves that the whisky is distilled by Jas. E. Pepper & Co." Can any construction of these words, however ingenious, escape the meaning that the whisky contained in the bottle upon which they are placed is whisky distilled by Jas. E. Pepper & Co.? "This whisky is distilled under the same formula and process used by the grandfather and father of our Mr. Jas. E. Pepper more than one hundred years ago." What whisky? The whisky contained in this bottle, of course, which the purchasing public has been assured by the gold label was Old Pepper whisky, distilled by Jas. E. Pepper &

Co.   Finally we have printed upon the caution notice:   "Bottled at the distillery warehouse, and warranted perfectly pure and non-adulterated."   The manifest advantage which "distillery" bottling has in the bottled whisky trade arises from the improbability that a distiller bottling whisky at his own distillery warehouse would bottle any whisky but that which he had distilled, and which could be drawn from the original packages in the warehouse.   The purpose of stating that the whisky was bottled at the distillery warehouse, therefore, is to clinch the proof that nothing is contained in the bottle but whisky made by Jas. E. Pepper & Co., unadulterated by mixture with it of anything else.   It is proven and admitted that Jas. E. Pepper & Co., for the 18 months preceding July, 1893, instead of bottling pure, unadulterated Old Pepper whisky has bottled a mixture of Pepper whisky and other whiskies, of which mixture 35 per cent. was not Pepper whisky.   In some months the mixture contained less Pepper than foreign whisky; in other months it contained more.   The average proportion of Pepper to other whisky, however, in the output of 18 months, was as 65 to 35.   To bottle such a mixture, and sell it under the trade label and caution notices above referred to, is a false representation, and a fraud upon the purchasing public.   A court of equity cannot protect property in a trade-mark thus fraudulently used. It is not material whether the foreign whisky mixed with Pepper's is as good or better whisky than Pepper's, or whether the mixture is better than pure Pepper whisky.   The public are entitled to a true statement as to the origin of the whisky, if any statement is made at all.   The complainants and Pepper are not to be protected in a deception of the public, even if it works to the advantage of the public.   It is hardly necessary to say that the statement that the whisky is pure Pepper whisky is material.   The importance attached in the whisky trade to the fact that bottled whisky is of the make of a particular distillery is manifest both from common knowledge and also from the great particularity of statement and variety of proof offered of this in the various bottle trade-marks, labels, and advertisements shown in this case.   In view of the false and material statements contained in the trade label and caution notices of Jas. E. Pepper & Co., both that firm and their privies, the complainants in this suit, who may be reasonably presumed to have known the mode in which Pepper was carrying on his business, must be denied the equitable relief they ask.   I am inclined to think that the actual knowledge of complainants of the fraud is not material, for the reason that the only right they have in this controversy depends wholly on Pepper.   Moreover, it is quite improbable that with an agent to represent them at the distillery, complainants should not have received actual notice of the facts.

The only case which it is necessary to refer to is that of Medicine Co. v. Wood, 108 U. S. 218, 2 Sup. Ct. Rep. 436, where the principle which must govern this court in cases like the present is authoritatively settled.   It was there held that "a court of equity will extend no aid to sustain a claim to the trade-mark of an ar-

ticle which is put forth with a misrepresentation to the public as to the manufacturer and as to the place where it is manufactured, both of which particulars were originally circumstances to guide the purchaser of the medicine." Mr. Justice Field refers to the leading English case of Leather Cloth Co. v. American Leather Cloth Co., 4 De Gex, J. & S. 137, and 11 H. L. Cas. 523, and quotes with approval this language of the court, as follows:

"When the owner of a trade-mark applies for an injunction to restrain the defendant from injuring his property by making false representations to the public, it is essential that the plaintiff should not, in his trade-mark or in the business connected with it, be himself guilty of any false or misleading representation; for if a plaintiff makes any material false statement in connection with the property he seeks to protect he loses, and very justly, his right to claim the assistance of a court of equity."

"Where a symbol or label claimed as a trade-mark is so constructed or worded as to make it contain a distinct assertion which is false, I think no property can be claimed in it; or, in other words, the right to the exclusive use of it cannot be maintained."

See, also, Buckland v. Rice, 40 Ohio St. 526; Palmer v. Harris, 60 Pa. St. 156; Prince Manuf'g Co. v. Prince's Metallic Paint Co., (N. Y. App.) 31 N. E. Rep. 990.

The distinction sought to be made between a trade-mark containing an express statement of a falsehood and words intentionally so used as necessarily to raise an implication that is false, cannot be supported either on reason or authority. Moreover, in the present case, the false statements are express.

Counsel for complainants rely much on the case of Appeal of Pratt, 117 Pa. St. 401, 11 Atl. Rep. 878. In that case it appeared that farmers engaged in making butter under a trade-mark "Darlington" did not always use their own cream, and in rare instances, in an emergency, even bought butter made by others and sold it. The court disregarded this deception of the public, apparently on the maxim "de minimis non curat lex." Chief Justice Paxson does use some language, however, in arguendo that cannot be supported as sound. He gives as one reason for not entertaining the defense that complainants' trade-mark contained a false representation, the fact that the public were not complaining, and he, in effect, says that the fact that such a false representation was made would not justify defendant in appropriating complainants' trade-mark. The principle laid down in Medicine Co. v. Wood is always applied in trade-mark infringement cases, and the public is never present in them complaining. In such cases also the defendant is usually seeking to appropriate complainant's trade-mark, and to profit by the same fraud which he pleads as a ground for refusing complainant's relief. The reason why relief is refused complainant in such cases has nothing to do with defendant's rights or wrongs. It is that the court will not protect a fraudulent business of a plaintiff, however much in the wrong the defendant may be. If the reasoning of Chief Justice Paxson in the case referred to were sound, the principle of Medicine Co. v. Wood could never be followed.

Pepper offers as an excuse for bottling a mixture that the demand for his goods had so increased that he could not supply it with Pepper whisky. What was this demand for? Plainly for pure and unadulterated Pepper whisky, bottled at the distillery. If this could not be honestly supplied, then it could not be supplied at all in such a way as to keep the business within the protection of a court of equity. Whether Peebles, by selling, as agent of Pepper and complainants, the distillery bottled goods, connived at the sale of the mixture as pure Pepper whisky after he knew its exact origin or not, is wholly immaterial. Relief is refused to Pepper and his privies because of his misrepresentations to the public.

The motion for a preliminary injunction is denied.