SIEGERT et al. v. GANDOLFI et al.

(Circuit Court, S. D. New York. August 4, 1905.)

1. TRADE-MARKS—RIGHT TO NAME—"ANGOSTURA BITTERS."

Complainants, manufacturers of bitters at Port of Spain, Trinidad, under the firm name of "Dr. J. G. B. Siegert and Sons," *held* on the evidence not entitled to the exclusive use of the name "Angostura" as a trade-mark or trade-name in connection with their product, but the firm of C. W. Abbott & Co., of Baltimore, manufacturers of bitters sold by defendant, *held* entitled to use such name in the way it does use it, on evidence showing that such firm and its predecessors have continuously used it in connection with their product for more than 50 years.

2. UNFAIR COMPETITION—RIGHT TO PROTECTION IN EQUITY—FRAUDULENT REPRESENTATIONS.

A manufacturer of bitters, which in its advertisements to the public sets out what purports to be certificates of chemists and medical experts stating that they have analyzed such bitters, that they contain no ingredients which are harmful or intoxicating, and recommending them for use by invalids, both adults and children, when in fact such bitters contain more than 40 per cent. of alcohol, is guilty of fraudulent misrepresentation, and is not entitled to invoke the aid of a court of equity to protect its product against alleged unfair competition.

[Ed. Note.—For cases in point, see vol. 46, Cent. Dig. Trade-Marks and Trade-Names, § 94.

Unfair competition in trade, see notes to Scheuer v. Muller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A. 376.]

3. SAME—EVIDENCE CONSIDERED.

Evidence considered, and *held* not to establish fraudulent conduct on the part of a manufacturer, or any acts constituting unfair competition in trade, which would entitle complainants to equitable relief.

Suit in equity to enforce the alleged rights of the complainants to the use of the word "Angostura" as a trade-name for the bitters of their manufacture, and to restrain alleged unlawful competition by defendants in putting up and selling bitters in such close imitation of complainants' goods, name, packages, labels, etc., that persons desiring to purchase complainants' goods, bitters, are deceived into purchasing bitters made by one Cornelius W. Abbott. It is not extravagant to say that substantially all the defenses known to the law are pleaded.

Arthur Furber (William M. Copeland, of counsel), for complainants.

John Brooks Leavitt, for defendants.

RAY, District Judge. It appears from the evidence that at some time prior to 1830, or about that time, one Johannes G. B. Siegert, a German, and probably a physician and surgeon, settled at Angostura, Venezuela, South America. Here he commenced the manufacture of certain bitters. After a time—it is impossible to fix any definite date—these bitters were sent out of the country, Venezuela, and were called and labeled "Aromatic Bitters," a purely descriptive name. As these bitters were made at, and sent out wherever there was a market for them, from Angostura, they

undoubtedly came to be known as "Angostura Bitters." In 1875 the factory for manufacturing these bitters was removed from Angostura, then Ciudad Bolivar, to Port of Spain, Trinidad. J. G. B. Siegert was now dead, and the business was carried on by Carlos D. and Alfredo C., two sons, who took in a third in 1876. About this time one Meinhard registered in England the name "Angostura Bitters" for bitters made by him, whereupon complainants changed their label so that the headings of the panels of the descriptive matter wrapped about the bitters which had read "Aromatic Bitters, prepared by Dr. Siegert at Angostura" (now Ciudad Bolivar), were made to read "Aromatic Bitters or Angostura Bitters, prepared by Dr. Siegert at Angostura, now in Port of Spain, Trinidad." Between 1881 and 1886, in consequence of a decision of the courts of Maryland that this label misrepresented as to the person by whom the bitters were prepared, the label was changed to read "Aromatic Bitters or Angostura Bitters formerly prepared at Angostura by Dr. Siegert, and now in Port of Spain, Trinidad, by his sons and successors, under the old firm or name of Dr. J. G. B. Siegert & Hijos." It is clear from the evidence that neither Siegert nor his sons ever selected and applied the name "Angostura" to these bitters as their name or designation. The original Siegert and the sons named and sold them as "Aromatic Bitters," a purely descriptive name, until others, and more than one, had commenced to manufacture similar bitters, and name and sell them as "Angostura Bitters." Others were making and selling Angostura Bitters as early as in the 60's, and there is credible evidence that this was done many years earlier. It will be noted that as late as in the 80's these complainants were clinging to the original name of these bitters, "Aromatic Bitters." True, they say "Aromatic or Angostura," but this adding of "or Angostura" was after competitors had come into the field with bitters which such competitors called "Angostura Bitters." True, these bitters from Angostura, Venezuela, South America, had come, with those who took pains to note the place of manufacture, to be called Angostura Bitters, the same as we distinguish the Ohio buggies or wagons from the New York or New England vehicles. It was not until 1871 that the Siegerts registered a trade-mark in the United States. The first was "J. G. B. Siegert's Angostura Bitters." This recognized that there were other "Angostura Bitters" on the market, as in fact there were and had been for years. In 1873 the registration "Angostura Bitters" was made as a trade-mark. Those registrations were made in the interest of complainants. But they gave notice of a claim. They did not change any existing fact. The evidence shows some effort by the complainants to enjoin the use of the name "Angostura Bitters," etc., by others; but in one case, at least, the action failed for the reason that complainants were not in a court of equity with clean hands. It is not satisfactorily shown that the Siegert bitters were the only ones made in Angostura, or that region, even, that came to be called by the public Angostura Bitters. This court cannot find from the

evidence that complainants ever became entitled to the name "Angostura Bitters" as their trade-mark or trade-name. Until in the 80's, as said, they did not give their goods that name, except to show that they were the same as "Angostura Bitters." Prior to that the name was "Aromatic Bitters," the alternative name "Angostura Bitters." Why this alternative name? Evidently to show to the public they were the same as the bitters on the market known as "Angostura Bitters." But the claim was not made that this was the name. There is an aromatic bark coming from Venezuela known as "Angostura bark." There was a city on the Orinoco river called Angostura. Angostura is a common name in the Spanish language. One meaning is "narrow" or "contracted." At the point where the city of Angostura was and is situated the river narrows. These narrows were known as "The Angostura." While there are many places, towns, or cities in old Spain and Spanish territory named "Angostura," I have no doubt the city of Angostura on the Orinoco river was given that name because of these narrows. After all, the first settlers there may have been from Angostura, in old Spain, and may have named the place from their home town. Boatmen approaching them say, "We are coming to the angostura," meaning the narrows of the river, not the city.

There was much contention on the argument, and there is not a little in the evidence, as to how the former city of Angostura, South America, has been called of late years. In "Cram's New Unrivaled Atlas of the World," published in 1902, the map of Colombia, Ecuador, Venezuela, and British, Dutch, and French Guiana (all one map) gives "Angostura" as the name of the city. It is so shown on the map proper. The name "Ciudad Bolivar" is not on the map. In the margin, among the names of the principal cities, we find both, however. This is a sample, and shows on what frail foundation we stand, when, as in one of the decisions, we attempt to decide this controversy in favor of complainants on the ground no such place as "Angostura" in Venezuela has existed for half a century. In the "New National Encyclopedia," published in 1896, we find: "Angostura, or Ciudad Bolivar, a seaport town of Venezuela, on the Orinoco river about 240 miles from its mouth. It is built at a point or pass (angostura) where on both sides the river is narrowed," etc. In Chambers' Encyclopedia, published in 1870, we find: "Angostura, a seaport town of Venezuela, * * * on the right bank of the Orinoco," etc. There is no mention of Ciudad Bolivar. By law the name of the city was changed in 1846 to Ciudad Bolivar. But while statutes may change the name of a place for certain legal purposes, it cannot change the popular name or name by which in many instances people will know and speak of it.

Complainants' bitters are an aromatic bitters, compounded from vegetable substances dissolved in alcohol, which preserves their therapeutic properties. This is the contention of complainants. These bitters contain about 40 per cent. of alcohol. In extensively

advertising these bitters the complainants themselves, and by agents, put out circulars and represent to the public as follows:

Scientific Opinions on the Angostura Bitters of Messrs. Dr. J. G. B. Siegert & Sons.

"I have subjected the Aromatic Bitters of Messrs. Dr. J. G. B. Siegert & Sons to a very searching examination, consisting of a chemical analysis, and an investigation for determining the strength of the drugs and their physiological effects.

"The result of these investigations proves the Aromatic Bitters to be entirely free from all insalutary, over-active, acrid and intoxicating ingredients. The Bitters, on the contrary, only contain most beneficial ingredients, such as bitter, aromatic, balsamic, tonic, strengthening and antiasthenic vegetable substances, particularly those which are derived from plants which are indigenous to tropical America. For this reason the European imitations of Dr. Siegert's Bitters cannot be equal to the genuine and original American Bitters, because the corresponding extracts are never sent to Europe. The artistic combination of these excellent ingredients renders the Bitters of Dr. Siegert one of the purest and most useful hygienic liqueurs now extant, as it can be used by invalids and those in good health, by adults and by children, with equal advantage. For the public this liqueur forms an attractive social drink, and for the sick a useful remedy, which may be particularly recommended in complaints of the stomach and bowels, want of appetite, weakness of the stomach, difficult and painful digestion, complaints of the liver, jaundice, hypochondriasis, hysteria, lowness of spirits, cholerine, cholera, diarrhœa, vomiting, sea-sickness, etc., and also as a safe domestic cordial.

"The foregoing I hereby certify according to the best of my knowledge and in all good faith.                              Dr. Hess,
                              "Approved Royal Prussian Apothecary
                              "(1st Class), Examining Chemist,
                              "and Scientific Expert."

"The Angostura Bitters only contain most beneficial ingredients, such as aromatic, balsamic, tonic, strengthening and antiasthenic vegetable substances, which render this bitters one of the purest and most useful hygienic cordials now extant. They can be used by invalids, and those in good health, by adults, and by children, with equal advantage, and may be particularly recommended in complaints of the stomach and bowels, want of appetite, difficult and painful digestion, complaints of the liver, jaundice, hysteria, lowness of spirit, etc..
                              "Dr. Hess,
                              "Examining Chemist and Scientific Expert."

"The Aromatic Bitters of Messrs. Dr. J. G. B. Siegert & Sons is doubtless one of the most beneficial discoveries of the present time. They possess a tendency to excite the appetite, strengthen the digestion, and promote the natural motion of the intestinal canal, and the annihilation of the food, in this manner furthering the formation of blood, so that the disturbance in these functions of the body, which produce certain indispositions, are either prevented or cured.                              Dr. John Muller.
                              "Medical Council, Berlin."

"From a medical point of view, this essence (the Angostura Bitters) is to be recommended in the following diseases: want of appetite, complaints and cramps of the stomach, hemorrhoids, dyspepsia, malaise, cholera and cholerine, and also as a preventative of contagious diseases. These bitters are the most powerful stomachic and nervine which we possess, and therefore may be warmly recommended by medical men.                              A. Groyen,
                              "Doctor in Medicine and Surgery,
                              "Berlin Royal Medical Staff."

It cannot be maintained that these statements are true. I am not satisfied that Dr. Hess, examining chemist and scientific ex-

pert, ever existed. So of Dr. Groyen and Dr. Muller. Such persons may have lived, but the evidence strongly indicates that they are mythical persons as chemists, etc., and, if chemists, of little consequence or standing. There are cases holding that a certain amount of misstatement—so-called exaggeration—in advertising such concoctions is permissible. The idea seems to be that it is natural for men to exaggerate in advertising their goods, wares, and merchandise, and that courts ought to sympathize with this human weakness or natural business tendency, and sanction it as a necessary business expedient. We may be compelled to tolerate, but ought not to sanction, such measures. All this may be tolerated as necessary in carrying on our diplomatic relations, but not in our judicial system. We grant no patent rights on "exaggeration." With honest exaggeration or extravagance of statement born of zeal or overestimate of quality this court finds no fault. But when exaggeration assumes the form of intentional misrepresentation as to the uses and qualities and composition, etc., of articles of this description, the courts are bound in common honesty to refuse to sanction it in any way. Shall the courts give by judicial decree a monopoly to certain persons who represent to the public that certain bitters contain nothing intoxicating, when concededly they contain over 50 per cent. of water and over 40 per cent. of alcohol and about 8 per cent. of we know not what?

In Manhattan Medicine Co. v. Wood, 108 U. S. 218, at page 227, 2 Sup. Ct. 436, at page 442 (27 L. Ed. 706), we find this language, taken from Fetridge v. Wells, 4 Abb. Prac. (N. Y.) 144, viz.:

"Those who come into a court of equity, seeking equity, must come with pure hands and a pure conscience. If they claim relief against the frauds of others, they must themselves be free from the imputation. If the sales made by the plaintiff and his firm are effected, or sought to be, by misrepresentation and falsehood, they cannot be listened to when they complain that by the fraudulent rivalry of others their own fraudulent profits are diminished. An exclusive privilege for deceiving the public is assuredly not one that a court of equity can be required to aid or sanction. To do so would be to forfeit its name and character."

This statement is quoted by the Supreme Court with approval, and I am not aware that that court has receded from that position. It is a doctrine that meets my hearty approval, and seems applicable in this case. In fact, in Worden v. California Fig Syrup Co., 187 U. S., at page 531, 23 Sup. Ct., at page 165 (47 L. Ed. 282), the case is cited with approval, as are many others to the same effect. Siegert v. Abbott, 61 Md. 276, 48 Am. Rep. 101 (involving these bitters of complainants), is also cited with approval at page 528 of 187 U. S., and page 164 of 23 Sup. Ct. (47 L. Ed. 282), notwithstanding that Brown on Trade-Marks has questioned its authority. If in drawing the line between truth and falsehood in advertising such compounds as these, or those similar, we are to permit any misrepresentation whatever, the degree or amount of misrepresentation must rest in judicial discretion, and depend upon the malleability or flexibility or susceptibility of the conscience of

the court, of the particular judge hearing and deciding the case. It seems to me the place to draw the line is between truth and falsehood, and that actual misrepresentation is outside the protection of a court of equity.

In Krauss v. Jos. R. Peebles' Sons Co. et al. (C. C.) 58 Fed. 585, cited and approved by the Supreme Court of the United States (187 U. S. 532, 23 Sup. Ct. 166 [47 L. Ed. 282]), whisky, represented in labels on the bottles to be pure Pepper whisky, contained 35 per cent. of other whisky—that is, 35 per cent. of lie or misrepresentation—and 65 per cent. of Pepper whisky or truth. It was held that complainants must be denied all relief. Taft, Circuit Judge, at page 594, said:

"To bottle such a mixture, and sell it under the trade label and caution notices above referred to, is a false representation, and a fraud upon the purchasing public. A court of equity cannot protect property in a trade-mark thus fraudulently used. It is not material whether the foreign whisky mixed with Pepper's is as good or better whisky than Pepper's, or whether the mixture is better than pure Pepper whisky. The public are entitled to a true statement as to the origin of the whisky, if any statement is made at all. The complainants and Pepper are not to be protected in a deception of the public, even if it works to the advantage of the public."

The learned judge then cites Medicine Co. v. Wood, 108 U. S. 218, 2 Sup. Ct. 436, 27 L. Ed. 706, Leather Cloth Co. v. American Leather Cloth Co., 4 De Gex, J. & S. 137, and 11 H. L. Cas. 523, making a pertinent quotation therefrom, and also Buckland v. Rice, 40 Ohio St. 526; Palmer v. Harris, 60 Pa. 156, 100 Am. Dec. 557; Prince Manufacturing Co. v. Prince's Metallic Paint Co. (N. Y.) 31 N. E. 990, 17 L. R. A. 129. He also calls attention to Appeal of Pratt, 117 Pa. 401, 11 Atl. 878, 2 Am. St. Rep. 676, but fails to approve the case. In fact he disapproves, as does this court, and says: "If the reasoning of Chief Justice Paxson in the case referred to were sound, the principle of Medicine Co. v. Wood could never be followed." This court is of opinion that it is a materially false statement to advertise these bitters of the complainants as free from "intoxicating ingredients," and fit to be given children as well as adults as a medicine and a tonic, and even as a beverage, when in fact nearly one-half of every dose taken is composed of alcohol. It may be and probably is true that certain remedies given to children contain alcohol. It may be that no harm comes of it in cases where necessity demands the giving of those remedies. It may not be so. Great harm may come to certain constitutions. The giving of alcohol to children of tender years and delicate constitutions may work disastrous results. Every purchaser and every user of complainants' bitters is entitled to know, so far as the representations actually made are concerned, the exact truth. This representation claimed to emanate from "Dr. Hess, Approved Royal Prussian Apothecary (1st Class) Examining Chemist and Scientific Expert," viz., "I have subjected the Aromatic Bitters of Messrs. Dr. J. G. B. Siegert & Sons to a very searching examination, consisting of a chemical analysis, and an investigation for determining the strength

of the drugs and their physiological effects. The result of these investigations proves the Aromatic Bitters to be entirely free from all insalutary, over-active, acrid and intoxicating ingredients. The bitters, on the contrary, only contain most beneficial ingredients, such as bitter, aromatic, balsamic, tonic, strengthening and anti-asthentic vegetable substances, particularly those which are derived from plants which are indigenous to tropical America." "Entirely free from all * * * intoxicating ingredients." "Only contain most beneficial ingredients." And they, containing over 40 per cent. of alcohol (a concealed fact), are stated to be and recommended as a safe remedy for "complaints of the liver" and "jaundice" and "hysteria," etc. "They can be used by invalids and those in good health, by adults and by children, with equal advantage." The evidence shows that given in some of the complaints for which they are recommended they would prove positively harmful. In this enlightened age but few parents would care to give to their infant children, even in small doses, a mixture containing 40 per cent. of alcohol. These statements are given out to the world as an inducement to the sick or ailing to purchase and use and give to their sick and ailing children. In Prince Manufacturing Company v. Prince's Metallic Paint Co., 135 N. Y. 24, 31 N. E. 990, 17 L. R. A. 129, cited and approved by the Supreme Court of the United States in Worden v. California Fig. Syrup Co., 187 U. S. 529, 23 Sup. Ct. 164, 47 L. Ed. 282, the court said:

"Any material misrepresentation in a label or trade-mark as to the person by whom the article is manufactured, or as to the place where manufactured, or as to the materials composing it, or any other material false misrepresentation, deprives a party of the right to relief in equity. The courts do not, in such cases, take into consideration the attitude of the defendant. * * * And although the false article is as good as the true one, the privilege of deceiving the public even for their own benefit is not a legitimate subject of commerce."

In the Pepper Whisky Case, already cited, we have found that a mere substitution of one whisky for another, to the extent of 35 per cent. only, defeated recovery. In the case now under consideration we have the insertion of 40 per cent. of alcohol into bitters recommended for children, and represented to be free from all intoxicants; that is, alcohol. I cannot find that this representation is either immaterial or innocent.

So they are advertised and represented as follows: "These bitters are the most powerful stomachic and nervine which we possess, and therefore may be warmly recommended by medical men." This is given to the public as a recommendation made by one "A. Groyen, Doctor in Medicine and Surgery, Berlin Royal Medical Staff." When the complainants put out this statement, even if it was made by Groyen, and if he was what the paper represents him to have been, they vouch for the truthfulness of the statement. It is shown not to be true.

In the manufacture of the bitters sold by defendants Angostura bark is used, and defendants insist the name "Angostura" was ap-

plied to this article because of this fact. The bitters are manu-
factured by C. W. Abbott & Co., of Baltimore, Md., U. S. A. This.
firm and its predecessor have been making these bitters for about
half a century. These bitters have always been named, described,.
advertised, labeled, and sold by Abbott as "Angostura Aromatic·
Bitters," which name is immediately followed on the labels and
in the advertisements, etc., by a plain unequivocal statement that.
they are prepared at Baltimore, Md., U. S. A., giving the street and
number, by (now) C. W. Abbott & Co. The heading of the label'
in use when this suit was commenced reads, "Angostura Aromatic
Bitters, prepared by C. W. Abbott & Co., 17 S. Charles St. Balti--
more, Md., U. S. A." At the very beginning of this label, and·
where all who look at and read the label at all must see it, is a cau-
tion notice in plain bold letters, which reads as follows, and bears.
the fac simile signature C. W. Abbott & Co., viz.:

"Copyrighted March, 1873—Registered Dec., 1877—Re-registered April, 1884.

   "Caution:—Other articles having been placed upon the market and given
the name Angostura Aromatic Bitters, originally adopted by us, and sold in
bottles which are enveloped in labels or wrappers so nearly resembling ours·
that some consumers might possibly have worthless imitations imposed upon
them instead of our Angostura Aromatic Bitters. We as a better protection
to the public and a guarantee of the genuineness of C. W. Abbott & Co's An-
gostura Aromatic Bitters wrap each bottle with label bearing fac-simile of
our signature and will have our name 'C. W. Abbott & Co., Baltimore,' blown
in the shoulder and bottom of the bottle.          C. W. Abbott & Co."

It is difficult to understand how any observing person paying
any attention whatever to what he is purchasing can be misled
into purchasing Abbott's bitters when he desires Siegert's. Both·
have been on the market for half a century. There has been liti-
gation and newspaper comment and advertisements galore. It
must be common knowledge—knowledge as common as that there
are more than one kind of bitters extant—that Siegert makes and
sells "Aromatic Bitters or Angostura Bitters," made in Trinidad,
South America, and that Abbott makes and sells "Angostura Aro-
matic Bitters," made at Baltimore, Md., U. S. A. The labels say
this, the advertisements say this, the papers say this, the litigations.
say this, and on the bottles containing the fluid we find the name·
of Siegert and Abbott respectively. The general form and· size.
of the bottles is similar, but the evidence does not establish that
Abbott copied or intends to imitate. On the whole evidence this.
court cannot say that the labeling, advertising, and mode of putting·
up and on the market the bitters of Abbott are calculated to deceive
or mislead the public. It may be that in some cases individual pur-
chasers, who are careless in making purchases, will be deceived;.
but such cases will be rare indeed. This court does not think that
the general public inquiring for and desiring to purchase Angostura
Bitters, whether consumers or dealers, have in mind the bitters.
made and sold by the complainants. Some do and some do not,.
undoubtedly; but I do not think the general or prevailing idea
or impression is, or even has been, that Angostura Bitters are a.

manufacture of Siegert's exclusively. Such a conclusion is not justified by the evidence. Angostura bark, which is aromatic, is one of the main ingredients of defendants' bitters.

Carefully considering all the evidence in this case, I have arrived at the conclusions: (1) That complainants are not entitled to the use of the word "Angostura" in connection with bitters made by them, or otherwise, as a trade-mark or a trade-name; (2) that C. W. Abbott & Co., the firm that makes the bitters sold by defendants, has the right to use the name "Angostura" in the way it does use it; (3) the complainants have been guilty of such fraudulent misrepresentation in advertising and selling their bitters that they are not entitled to the protection of a court of equity; and (4) that Abbott & Co., whose bitters defendants sell, has not been guilty of any fraudulent conduct, or of any acts constituting or making a case of unfair competition in trade.

The defendants are entitled to a decree dismissing the bill of complaint, with costs.