## MANHATTAN MEDICINE COMPANY *v.* WOOD & Another.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MAINE.

Decided April 2d, 1883.

*Equity—Trade-Mark.*

A court of equity will extend no aid to sustain a claim to a trade-mark of an article which is put forth with a misrepresentation to the public as to the manufacturer of the article, and as to the place where it is manufactured, both being originally circumstances to guide the purchaser of the medicine.

When it is the object of a trade-mark to indicate the origin of manufactured goods, and a person affixes to goods of his own manufacture a trade-mark which declares that they are goods of the manufacture of some other person, it is a fraud upon the public which no court of equity will countenance.

The plaintiff claimed to be the owner of a patent medicine and of a trade-mark to distinguish it. The medicine was manufactured by the plaintiff in New York; the trade-mark declared that it was manufactured by another party in Massachusetts : *Held*, That he was entitled to no relief against a person using the same trade-mark in Maine.

Bill in equity to restrain the defendants from using an alleged trade-mark of the complainant, upon certain medicines prepared by them, and to compel an accounting for the profits made from its use in their sale of the medicines; also, the payment of damages for their infringement of the complainant's rights.

The complainant, a corporation formed under the laws of New York, manufactured in that State medicines designated as "Atwood's Vegetable Physical Jaundice Bitters;" and claimed as its trade-mark this designation, with the accompanying labels. Whatever right it possessed it derived by various mesne assignments from one Moses Atwood, of Georgetown, Massachusetts. The bill alleged that the complainant was, and for a long time previous to the grievances complained of had been the manufacturer and vender of the medicine mentioned; that it was put up and sold in glass bottles with twelve panel-shaped sides, on five of which in raised words and letters

"Atwood's Genuine Physical Jaundice Bitters, Georgetown, Mass." were blown in the glass, each bottle containing about a pint, with a light yellow printed label pasted on the outside designating the many virtues of the medicine, and the manner in which it was to be taken; and stating that it was manufactured by Moses Atwood, Georgetown, Mass., and sold by his agents throughout the United States.

The bill also alleged that the bottles thus filled and labelled were put up in half-dozen packages with the same label on each package; that the medicine was first invented and put up for sale about twenty-five years ago by one Dr. Moses Atwood, formerly of Georgetown, Massachusetts, by whom and his assigns and successors, it had been ever since sold "by the name, and in the manner, and with the trade-marks, label, and description substantially the same as aforesaid;" that the complainant was the exclusive owner of the formula and recipe for making the medicine, and of the right of using the said name or designation, together with the trade-marks, labels, and good will of the business of making and selling the same; that large sales of the medicine under that name and designation were made, amounting annually to twelve thousand bottles; that the defendants were manufacturing and selling at Portland, Me., and at other places within the United States unknown to the complainant, an imitation of the medicine, with the same designation and labels, and put up in similar bottles, with the same, or nearly the same, words raised on their sides, in fraud of the rights of the complainant and to its serious injury; that this imitation article was calculated and was intended to deceive purchasers, and to mislead them to use it instead of the genuine article manufactured by the complainant, and had had, and continued to have, that effect. The bill, therefore, prayed for an injunction to restrain the defendants from affixing or applying the words "Atwood's Vegetable Physical Jaundice Bitters," or either of them, or any imitation thereof, to any medicine sold by them, or to place them on any bottles in which it was put up, and also, from using any labels in imitation of those of the complainant. It also prayed for an accounting of profits and for damages.

Among the defences interposed were these: that Moses Atwood never claimed any trade-mark of the words used in connection with the medicine manufactured and sold by him; and assuming that he had claimed the words used as a trade-mark, and that the right to use them had been transferred to the assignors of the complainant, it was forfeited by the misrepresentation as to the manufacture of the medicine on the labels accompanying it, a misrepresentation continued by the complainant.

The cause was heard before Clifford, J., and the bill was dismissed with costs. From this decree the plaintiffs appealed.

*Mr. Philo Chase* for appellant.—The main part of this brief was occupied with a discussion of the facts. The following points of law were taken. The name adopted was a good trade-mark, assignable, and entitled to protection in the hands of the assignee. *McLean* v. *Fleming,* 96 U. S. 245; *Kidd* v. *Johnson,* 100 U. S. 617; *Hall* v. *Barrows,* 4 DeG. J. & S. 150; 33 L. J. (N. S.) 204; 10 Jurist (N. S.), 55; *Fulton* v. *Sellers,* Penn. Sup. Ct. 4 Brewster, 42; *Field* v. *Lewis,* Seten, 4th ed. 237. The law will not allow one man to sell his goods as those of another by the use of similar labels. *Perry* v. *Truefitt,* 6 Beavan, 66; *Croft* v. *Day,* 7 id. 84; *Taylor* v. *Carpenter,* 11 Paige, 292; *Coffeen* v. *Brinton,* 5 McLean, 256; *Taylor* v. *Taylor,* 2 Eq. Rep. 290; *Farina* v. *Silverlock,* 2 Jurist (N. S.), 1008; *Brooklyn White Lead Co.* v. *Masury,* 25 Barb. 416; *Edelston* v. *Edelston,* 9 Jurist (N. S.), 479; *Boardman* v. *The Meriden Britannia Co.,* 35 Conn. 402; *Colman* v. *Crump,* 70 N. Y. 573. A transfer and succession of business of an article carries with it its trade-marks by implication. *Shipwright* v. *Clements,* 19 W. R. 599; *The Congress and Empire Spring Co.* v. *The High Rock Spring Co.,* 45 N. Y. 291. The law presumes when one intentionally uses or closely imitates another's trade-marks, merchandise, or manufactures, that he does it for the fraudulent purpose of inducing the public or those dealing in the article to believe that the goods are those made or sold by the latter, and of supplanting him in the good will of his trade or business. *Taylor* v. *Carpenter,* 11 Paige, 292. The rule is that the court will enjoin any imitation calculated to deceive ordinary pur-

chasers. *Crawshay* v. *Thompson*, 4 Man. & G. 385; *Davis* v. *Kendall*, 2 R. I. 556; *Holmes* v. *Holmes, &c., Company*, 37 Conn. 278; *Wotherspoon* v. *Currie*, 22 L. T. R. (N. S.), 260; *Hookman* v. *Pottage*, 26 L. T. R. (N. S.), 755. To be enjoinable it is not necessary that the imitation should be complete; the imitation may be limited and partial, and still be enjoinable. *Lock-wood* v. *Boswick*, 2 Daly (N. Y.), 521; *Franks* v. *Weaver*, 10 Beavan, 297; *Coffeen* v. *Brinton*, 4 McLean, 516; *Shrimpton* v. *Laight*, 18 Beavan, 164; *Walton* v. *Crowley, supra ; Clark* v. *Clark*, 25 Barbour (N. Y.), 76; *Brooklyn White Lead Company*, v. *Masury*, id. 416; *Hostetter* v. *Bowinkle*, 1 Dillon, 329. To be enjoinable it is not requisite that the imitation should be intentionally deceptive. *Millington* v. *Fox*, 3 Mylne & Cr. 338; *Dale* v. *Smithson*, 12 Abb. Pr. R. (N. Y.). It is no defence that the imitator informs purchasers of the imitation. It is no answer for the defendants to say that they sold the bitters as theirs. *Coats* v. *Holbrook*, 2 Sandf. Ch. 586; *Chappel* v. *Davidson*, 2 Kay & J. 123. It is sufficient to establish a case for relief to show that the imitation has led or is likely to lead to mistakes. *Clement* v. *Maddick*, 5 Jurist (N. S.), 592. The plaintiff, in trade-mark cases, is entitled to relief, though the respondent did not know that the mark used was a trade-mark. *Kinahan* v. *Bolton*, 15 Irish Ch. 75; *Harrison* v. *Taylor*, 11 Jurist (N. S.), 408; *Hall* v. *Barrows*, 10 id. (N. S.), 55; *Ainsworth* v. *Walmsley*, 12 id. 205. The fact that the trade-marks were used in common by the several owners thereof, did not make them common property as to the world. *Condy* v. *Mitchell*, 26 W. R. 269; *Motley* v. *Dowman*, 3 My. & Cr. 1; *Robinson* v. *Finlay*, 27 W. R. 294; *Weston* v. *Ketcham*, 39 N. Y. Superior Court, 54; *Rogers* v. *Taintor*, 97 Mass. 291; *Sohl* v. *Geisendorf*, 1 Wilson (Ind.), 60. No statute of limitations bars the plaintiff of protection of its trade-marks. *Taylor* v. *Carpenter*, 3 Story, 458; *Taylor* v. *Carpenter*, 2 Wood & M. 1.

*Mr. Thorndike Saunders* also for appellant.

*Mr. William Henry Clifford*, for appellees.

MR. JUSTICE FIELD delivered the opinion of the court. After reciting the facts as stated above, he said:

In the view we take of the case, it will not be necessary to consider the first defence mentioned, nor the second, so far as to determine whether the right to use the words mentioned as a trade-mark was forfeited absolutely by the assignor's misrepresentations as to the manufacture of the article. It is sufficient for the disposition of the case, that the misrepresentation has been continued by the complainant. A court of equity will extend no aid to sustain a claim to a trade-mark of an article which is put forth with a misrepresentation to the public as to the manufacturer of the article, and as to the place where it is manufactured, both of which particulars were originally circumstances to guide the purchaser of the medicine.

It is admitted that whatever value the medicine possesses was given to it by its original manufacturer, Moses Atwood. He lived in Georgetown, Massachusetts. He manufactured the medicine there. He sold it with the designation that it was his preparation, "Atwood's Vegetable Physical Jaundice Bitters," and was manufactured there by him. As the medicine was tried and proved to be useful, it was sought for under that designation, and that purchasers might not be misled, it was always accompanied with a label, showing by whom and at what place it was prepared. These statements were deemed important in promoting the use of the article and its sale, or they would not have been continued by the assignees of the original inventor. And yet they could not be used with any honest purpose when both statements had ceased to be true. It is not honest to state that a medicine is manufactured by Moses Atwood, of Georgetown, Massachusetts, when it is manufactured by the Manhattan Medicine Company in the city of New York.

Any one has an unquestionable right to affix to articles manufactured by him a mark or device not previously appropriated, to distinguish them from articles of the same general character manufactured or sold by others. He may thus notify the public of the origin of the article and secure to himself the benefits of any particular excellence it may possess from the manner or materials of its manufacture. His trademark is both a sign of the quality of the article and an assur-

ance to the public that it is the genuine product of his manufacture. It thus often becomes of great value to him, and in its exclusive use the court will protect him against attempts of others to pass off their products upon the public as his. This protection is afforded not only as a matter of justice to him, but to prevent imposition upon the public. *Manufacturing Co.* v. *Trainer*, 101 U. S. 51.

The object of the trade-mark being to indicate, by its meaning or association, the origin or ownership of the article, it would seem that when a right to its use is transferred to others, either by act of the original manufacturer or by operation of law, the fact of transfer should be stated in connection with its use; otherwise a deception would be practised upon the public, and the very fraud accomplished, to prevent which courts of equity interfere to protect the exclusive right of the original manufacturer. If one affix to goods of his own manufacture signs or marks which indicate that they are the manufacture of others, he is deceiving the public and attempting to pass upon them goods as possessing a quality and merit which another's skill has given to similar articles, and which his own manufacture does not possess in the estimation of purchasers. To put forth a statement, therefore, in the form of a circular or label attached to an article, that it is manufactured in a particular place, by a person whose manufacture there had acquired a great reputation, when, in fact, it is manufactured by a different person at a different place, is a fraud upon the public which no court of equity will countenance.

This doctrine is illustrated and asserted in the case of *The Leather Cloth Company (limited)* v. *The American Leather Cloth Company (limited)*, which was elaborately considered by Lord Chancellor Westbury, and afterwards in the House of Lords on appeal from his decree. 4 DeG. J. & S. 137, and 11 House of Lords' Cases, 523.

In that case, an injunction was asked to restrain the defendant from using a trade-mark to designate leather cloth manufactured by it, which trade-mark the complainant claimed to own. The article known as leather cloth was an American invention, and was originally manufactured by J. R. & C. P.

Crockett, at Newark, New Jersey. Agents of theirs sold the article in England as "Crockett's Leather Cloth." Afterwards a company was formed entitled "The Crockett International Leather Cloth Company," and the business previously carried on by the Crocketts was transferred to this company, which carried on business at Newark, in America, as a chartered company, and at West Ham, in England, as a partnership. In 1856, one Dodge took out a patent in England for tanning leather cloth and transferred it to this company. In 1857 the complainant company was incorporated, and the international company sold and assigned to it the business carried on at West Ham, together with the letters patent, and full authority to use the trade-mark which had been previously used by it in England. A small part of the leather cloth manufactured by the complainant company was tanned or patented. It, however, used a label which represented that the articles stamped with it were the goods of the Crockett International Leather Cloth Company; that they were manufactured by J. R. & C. P. Crockett; that they were tanned leather cloth; that they were patented by a patent obtained in 1856, and were made either in the United States or at West Ham, in England. Each of these statements or representations was untrue so far as they applied to the goods made and sold by the complainant.

The defendant having used on goods manufactured by it a mark having some resemblance to that used by the complainant, the latter brought suit to enjoin the use. Vice-Chancellor Wood granted the injunction, but on appeal to the Lord Chancellor the decree was reversed and the bill dismissed. In giving his decision the Lord Chancellor said that the exclusive right to use a trade-mark with respect to a vendible commodity is rightly called property; that the jurisdiction of the court in the protection of trade-marks rests upon property, and that the court interferes by injunction because that is the only mode by which property of that description can be effectually protected. But, he added:

"When the owner of the trade-mark applies for an injunction to restrain the defendant from injuring his property by making

false representations to the public, it is essential that the plaintiff should not in his trade-mark, or in the business connected with it, be himself guilty of any false or misleading representation ; for if the plaintiff makes any material false statement in connection with the property he seeks to protect, he loses, and very justly, his right to claim the assistance of a court of equity."

And again :

" Where a symbol or label, claimed as a trade-mark, is so constructed or worded as to make or contain a distinct assertion which is false, I think no property can be claimed in it, or, in other words, the right to the exclusive use of it cannot be maintained."

When the case reached the House of Lords the correctness of this doctrine was recognized by Lord Cranworth, who said that of the justice of the principle no one could doubt ; that it is founded in honesty and good sense, and rests on authority as well as on principle, although the decision of the House was placed on another ground.

The soundness of the doctrine declared by the Lord Chancellor has been recognized in numerous cases. Indeed, it is but an application of the common maxim that he who seeks equity must present himself in court with clean hands. If his case discloses fraud or deception or misrepresentation on his part, relief there will be denied.

Long before the case cited was before the courts, this doctrine was applied when protection was sought in the use of trade-marks. In *Pidding* v. *How*, 8 Simons, 477, which was before Vice-Chancellor Shadwell in 1837, it appeared that the complainant was engaged in selling a mixed tea, composed of different kinds of black tea, under the name of "Howqua's Mixture," in packages having on three of their sides a printed label with those words. The defendant having sold tea under the same name, and in packages with similar labels, the complainant applied for an injunction to restrain him from so doing. An *ex parte* injunction, granted in the first instance, was dissolved, it appearing that the complainant had made false state-

ments to the public as to the teas of which his mixture was composed, and as to the mode in which they were procured. "It is a clear rule," said the vice-chancellor, "laid down by courts of equity, not to extend their protection to persons whose case is not founded in truth."

In *Perry* v. *Truefitt*, 6 Beav. 66, which was before Lord Langdale, master of the rolls, in 1842, a similar ruling was had. There it appeared that one Leathart had invented a mixture for the hair, the secret and recipe for mixing which he had conveyed to the plaintiff, a hair-dresser and perfumer, who gave to the composition the name of "Medicated Mexican Balm," and sold it as "Perry's Medicated Mexican Balm." The defendant, one Truefitt, a rival hair-dresser and perfumer, commenced selling a composition similar to that of plaintiff, in bottles with labels closely resembling those used by him. He designated his composition and sold it as "Truefitt's Medicated Mexican Balm." The plaintiff thereupon filed his bill, alleging that the name or designation of "Medicated Mexican Balm" had become of great value to him as his trade-mark, and seeking to restrain the defendant from its use. It appeared, however, that the plaintiff, in his advertisements to the public, had falsely set forth that the composition was "a highly concentrated extract from vegetable balsamic productions" of Mexico, and was prepared from "an original receipe of the learned J. F. Von Blumenbach, and was recently presented to the proprietor by a very near relation of that illustrious physiologist;" and the court, therefore, refused the injunction, the master of the rolls holding that, in the face of such a misrepresentation, the court would not interpose in the first instance, citing with approval the decision in the case of *Pidding* v. *How*.

In a case in the Superior Court in the city of New York— *Fetridge* v. *Wells*, 4 Abbott (N. Y.), 144—this subject was very elaborately and ably treated by Chief Justice Duer. The plaintiff there had purchased a recipe for making a certain cosmetic, which he sold under the name of "The Balm of a Thousand Flowers." The defendants commenced the manufacture and sale of a similar article, which they called "The Balm of Ten Thousand Flowers." The complainant, claiming the name

used by him as a trade-mark, brought suit to enjoin the defendants in the alleged infringement upon his rights. A temporary injunction was granted, but afterwards, upon the coming in of the proofs, it was dissolved. It appeared that the main ingredients of the compound were oil, ashes and alcohol, and not an extract or distillation from flowers. Instead of being a balm, the compound was a soap. The court said it was evident that the name was given to it and used to deceive the public, to attract and impose upon purchasers; that no representation could be more material than that of the ingredients of a compound recommended and sold as a medicine; that there was none so likely to induce confidence in its use, and none, when false, that would more probably be attended with injurious consequences. And, it also said:

" Those who come into a court of equity, seeking equity, must come with pure hands and a pure conscience. If they claim relief against the frauds of others, they must themselves be free from the imputation. If the sales made by the plaintiff and his firm are effected, or sought to be, by misrepresentation and falsehood, they cannot be listened to when they complain that, by the fraudulent rivalry of others, their own fraudulent profits are diminished. An exclusive privilege for deceiving the public is assuredly not one that a court of equity can be required to aid or sanction. To do so would be to forfeit its name and character."

See also *Seabury* v. *Grosvenor*, 14 Blatchford, 262; *Hobbs* v. *Francais*, 19 How. (N. Y.) 567; *Connell* v. *Reed*, 128 Mass. 477; *Palmer* v. *Harris*, 60 Penn. St. 156. The doctrine enunciated in all these cases is founded in honesty and good sense; it rebukes fraud and encourages fair dealing with the public. In conformity with it, this case has no standing before a court of equity.

*The decree of the court below dismissing the bill must therefore be affirmed ; and it is so ordered.*