**MITCHELL BROTHERS FILM GROUP and Jartech, Inc., Plaintiffs-Appellants,**

v.

**CINEMA ADULT THEATER, a/k/a Cinema 69, et al., Defendants-Appellees.**

No. 76–4251.

United States Court of Appeals, Fifth Circuit.

Oct. 16, 1979.

8. There actually is a Riverboat Room at the William Penn hotel in Pittsburgh. The name "Chuck Wagon" is also in current use.

Joseph Rhine, Robert L. Thorp, San Francisco, Cal., for plaintiffs-appellants.

Bennie R. Juarez, Joseph M. Revesz, Dallas, Tex., for Bola, Bradford, Rice & Smith.

Before GODBOLD, SIMPSON and MORGAN, Circuit Judges.

GODBOLD, Circuit Judge:

This is a copyright infringement suit, arising under the now-superseded Copyright Act of 1909.[1] But it is more than the usual commercial contest between copyright holder and alleged infringer. The infringers asserted as an affirmative defense that the copyrighted material—a movie—was obscene, and that, therefore, under the equitable rubric of "unclean hands" plaintiffs were barred from relief. After viewing the film the court found it obscene, adopted the unclean hands rationale, and denied relief to the copyright owners. Review of this holding requires us to consider the constitutional limits upon the power granted to Congress to issue copyrights, the manner in which Congress has chosen to exercise that power, and the applicability of the unclean hands doctrine.

Plaintiffs-appellants owned a properly registered copyright on a motion picture titled "Behind the Green Door," issued under the 1909 Act, 17 U.S.C. § 34 (1970) (repealed). Two groups of defendants, each group consisting of a theater and several individuals, obtained copies of the movie without plaintiffs' permission and infringed the copyright by exhibiting the film at the theaters. The Lido Art Theater group did not appear for trial, default judgment was entered against it and a statutory penalty awarded to plaintiffs. See 17 U.S.C. § 101(b) (1970) (repealed). The Cinema Adult Theater group appeared for trial, and after a bench trial the court found in its favor. On appeal the Cinema Adult group has not appeared.

We hold that the district court erred in permitting the assertion of obscenity as an affirmative defense to the claim of infringement, and, accordingly, reverse without reaching the question whether the film is obscene.

**I.  The statutory language**

The statutory provision that controls in this case reads:

The works for which copyright may be secured under this title shall include all the writings of an author.

17 U.S.C. § 4 (1970) (repealed). Motion pictures are unquestionably "writings" under the Copyright Act.[2]

The district court did not base its decision on standards found within the Act, which it described as "silent as to works which are subject to registration and copyright." The Act is not "silent." Rather, the statutory language "all the writings of an author" is facially all-inclusive, within itself admitting of no exceptions. There is not even a hint in the language of § 4 that the obscene nature of a work renders it any less a copyrightable "writing." There is no other statutory language from which it can be inferred that Congress intended that obscene materials could not be copyrighted.[3]

Moreover, there is good reason not to read an implied exception for obscenity into the copyright statutes. The history of content-based restrictions on copyrights, trademarks, and patents suggests that the absence of such limitations in the Copyright Act of 1909 is the result of an intentional policy choice and not simply an omission. See generally 74 Colum.L.Rev. 1351, 1354

---

1. 35 Stat. 1075, codified at 17 U.S.C. §§ 1–216 (1970) (repealed).

   Major changes in the law were made by the Copyright Act of 1976, 90 Stat. 2541, codified at 17 U.S.C. §§ 101–810 (1976, App.) (effective Jan. 1, 1978). We do not address the issue under the 1976 Act.

2. See, e. g., Hutchinson Amusement Co. v. Vitaphone Corp., 93 F.2d 176 (CA1, 1937); Time, Inc. v. Bernard Geis Assoc., 293 F.Supp. 130 (S.D.N.Y.1968); Jerome v. Twentieth Century Fox Film Corp., 67 F.Supp. 736 (S.D.N.Y.1946), aff'd, 165 F.2d 784 (CA2, 1948); cf. 17 U.S.C. § 5 (1970) (repealed) (required copyright applicants to classify works for which copyright

registration was sought; lists motion pictures among categories).

3. See 1 M. Nimmer, On Copyright § 2.17, at 2–193 (1978); Chafee, Coming into Equity with Clean Hands, 47 Mich.L.Rev. 1065, 1068 (1947); Schneider, Authority of the Register of Copyrights to Deny Registration of a Claim to Copyright on the Ground of Obscenity, 51 Chi.-Kent L.Rev. 691, 692–93 (1975); Note, Immorality, Obscenity and the Law of Copyright, 6 S.Dakota L.Rev. 109, 111 (1961); 74 Colum.L.Rev. 1351, 1354 (1974); 46 Fordham L.Rev. 1037, 1038 (1978).

n.27 (1974). From the first copyright act in 1790, Congress has seldom added restrictions on copyright based on the subject matter of the work, and in each instance has later removed the content restriction.[4] These congressional additions and subsequent deletions, though certainly not conclusive, suggest that Congress has been hostile to content-based restrictions on copyrightability.[5] In contrast Congress has placed explicit content-related restrictions in the current statutes governing the related areas of trademarks and patents. The Lanham Act prohibits registration of any trademark that "[c]onsists of or comprises immoral, deceptive, or scandalous matter," 15 U.S.C. § 1052(a), and inventions must be shown to be "useful" before a patent is issued. See 35 U.S.C. § 101.

The legislative history of the 1976 Act reveals that Congress intends to continue the policy of the 1909 Act of avoiding content restrictions on copyrightability. In recommending passage of the 1976 Act, the House Judiciary Committee stated:

> The phrase "original works of authorship," [§ 102] which is purposely left undefined, is intended to incorporate without change the standard of originality established by the courts under the present copyright statute. This standard does not include requirements of novelty, ingenuity, or *esthetic merit*, and there is no intention to enlarge the standard of copyright protection to require them.

H.R.Rep.No. 1476, 94th Cong., 2d Sess. 51, *reprinted in* [1976] U.S.Code Cong. & Admin.News pp. 5659, 5664 (emphasis added).

It appears to us that Congress has concluded that the constitutional purpose of its copyright power, "[t]o promote the Progress of Science and useful Arts," U.S.Const. art. 1, § 8, cl. 8, is best served by allowing all creative works (in a copyrightable format) to be accorded copyright protection regardless of subject matter or content, trusting to the public taste to reward creators of useful works and to deny creators of useless works any reward. It is not surprising that Congress would choose to rely on public acceptability as a measure of a work's worth rather than on the judgment of such public officials as the Register of Copyrights[6] and federal and state judges. As Justice Holmes said, in rejecting the argument that under an earlier version of the Copyright Act the courts had a duty to pass upon the artistic merits of engravings and prints,

> It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the narrowest and most obvious limits.

S.Ct. 298, 47 L.Ed. 460 (1903), the language was deleted from the 1909 version of the Act, which is controlling in this case, leaving no content-based restrictions in the Act.

4. Congress has enacted two statutory copyright restrictions that were arguably content based, but afterwards repealed them. After the language "composition designed or suited for public representation," which was contained in the 1856 version of the Copyright Act, Act of August 18, 1856, 11 Stat. 138, was construed in *Martinetti v. Maguire*, 16 Fed.Cas. p. 920 (No. 9173) (C.C.Cal.1867) to mean that the moral content of the work had to be suitable for public consumption (rather than the more natural meaning of "suited" by form, *i. e.*, capable of being performed on the stage), Congress deleted the "suited" language from the next version of the Äct. See Act of July 8, 1870, 16 Stat. 198. A later version, Act of June 18, 1874, ch. 301, § 3, 18 Stat. 78, 79, contained language arguably placing content restrictions on the copyrightability of engravings, cuts and prints. (The Act provided that such works were copyrightable only if "connected with the fine arts.") After this language was narrowly construed by the Supreme Court, *see Bleistein v. Donaldson Lithograph Co.*, 188 U.S. 239, 23

5. *See, e. g.*, 17 U.S.C. § 8 (1970) (repealed) (copyright not available for works in public domain or for government publications); *cf.* 17 U.S.C.A. § 101 (1977 Supp.) (works not " 'fixed' in a *tangible medium of expression*" uncopyrightable under 1976 Act); Schneider, *supra* note 3, at 693 (regulations promulgated by Register of Copyrights under 1909 Act barred only material "deficient in quantity, originality or formal concreteness while obscenity suffers from lack of literary, social or artistic quality.")

6. *See* Schneider, *supra* note 3, at 703–21; *cf.* 41 Op.Att'y Gen. 395, 402 (1958) (suggesting that "for policy reasons, it may not be thought appropriate for the Register [of Copyrights] to undertake to be a conservator of public morals").

At the one extreme, some works of genius would be sure to miss appreciation. Their very novelty would make them repulsive until the public had learned the new language in which their author spoke. It may be more than doubted, for instance, whether the etchings of Goya or the paintings of Manet would have been sure of protection when seen for the first time. At the other end, copyright would be denied to pictures which appealed to a public less educated than the judge. Yet if they command the interest of any public, they have a commercial value,—it would be bold to say that they have not an aesthetic and educational value,—and the taste of any public is not to be treated with contempt.

*Bleistein v. Donaldson Lithograph Co.*, 188 U.S. 239, 251–52, 23 S.Ct. 298, 300, 47 L.Ed. 460, 462 (1903). The Ninth Circuit has recently voiced similar concerns in rejecting the defense of fraudulent content in copyright infringement actions:

> There is nothing in the Copyright Act to suggest that the courts are to pass upon the truth or falsity, the soundness or unsoundness, of the views embodied in a copyrighted work. The gravity and immensity of the problems, theological, philosophical, economic and scientific, that would confront a court if this view were adopted are staggering to contemplate. It is surely not a task lightly to be assumed, and we decline the invitation to assume it.

*Belcher v. Tarbox*, 486 F.2d 1087, 1088 (CA9, 1973).

In our view, the absence of content restrictions on copyrightability indicates that Congress has decided that the constitutional goal of encouraging creativity would not be best served if an author had to concern himself not only with the marketability of his work but also with the judgment of government officials regarding the worth of the work.

Further, if Congress were receptive to subject matter restrictions on copyright, there are many reasons why it would be unlikely to choose obscenity as one of those restrictions. Obscenity law is a concept not adapted for use as a means for ascertaining whether creative works may be copyrighted. Obscenity as a constitutional doctrine has developed as an effort to create a tolerable compromise between First Amendment considerations and police power. It is an awkward, barely acceptable concept that continues to dog our judicial system and society at large. The purpose underlying the constitutional grant of power to Congress to protect writings is the promotion of original writings, an invitation to creativity. This is an expansive purpose with no stated limitations of taste or governmental acceptability. Such restraints, if imposed, would be antithetical to promotion of creativity. The pursuit of creativity requires freedom to explore into the gray areas, to the cutting edge, and even beyond. Obscenity, on the other hand, is a limiting doctrine constricting the scope of acceptability of the written word.[7]

> Denial of [copyright] Registration could work to discourage the development of the Arts. At least one commentator has argued that denial of registration will increase the circulation of material to the public, by removing the right to sue for unauthorized publication and dissemination of copied material. [Cite omitted.] This view, however, ignores the potentially discouraging effect a stated policy of denial on the ground of obscenity would have on authors, publishers and promoters of works inhabiting the hazy border between obscenity and protected speech.

Schneider, *supra* note 3, at 719.

Society's view of what is moral and immoral continually changes. To give one example, in *Martinetti v. Maguire*, 16 Fed.

---

**7.** One commentator has suggested that the inconsistent purposes of the obscenity doctrine and the copyright power might render any use of the copyright power for the purpose of suppressing obscenity an unconstitutional misuse of the copyright power. "[P]olicies which dis-

courage creation and publication fail to pursue the constitutional justification for the grant of power to Congress to enact Copyright legislation: to promote the progress of science and the useful arts." Schneider, *supra* note 3, at 720.

Cas. p. 920 (No. 9173) (C.C.Cal.1867), the play "The Black Crook," because it featured women clad in flesh-colored tights, was held to be "grossly indecent, and calculated to corrupt the morals of the people" and hence uncopyrightable. By the early part of this century, it had become clear that this judgment reflected the moral standards ·of a bygone era:

> This case [*Martinetti*] probably is no more than a reflection of contemporary public opinion. The "Black Crook" with its plentitude of pink fleshings, scandalous as it may have seemed in the days of crinolines when legs—unless their very existence was genteelly denied—were vehicles, not spectacles, would probably bore a sophisticated modern audience, but would scarcely shock them. It would only make the tired business man tireder.

Rogers, *Copyright and Morals*, 18 Mich.L. Rev. 390, 398 (1920). It is obvious that many works shocking to the sensibilities of the public in 1920 would be entirely inoffensive today.

Denying copyright protection to works adjudged obscene by the standards of one era would frequently result in lack of copyright protection (and thus lack of financial incentive to create)[8] for works that later generations might consider to be not only non-obscene but even of great literary merit. *See* Phillips, *Copyright in Obscene Works: Some British and American Problems*, 6 Anglo-Am.L.Rev. 138, 168–69 (1977). Many works that are today held in high regard have been adjudged obscene in previous eras. English courts of the nineteenth century found the works of Byron, Southey and Shelley to be immoral. *See U.S. v. One Book Entitled Ulysses*, 72 F.2d 705, 708 (CA2, 1934). American courts have found these books, among others, obscene: Edmund Wilson, *Memories of Hecate County, see People v. Doubleday & Co.*, 297 N.Y. 687, 77 N.E.2d 6 (1947), aff'd per curiam by an equally divided court, 335 U.S. 848, 69 S.Ct. 79, 93 L.Ed. 398 (1948); Henry Miller, *Tropic of Cancer* and *Tropic of Capricorn, see Besig v. U. S.*, 208 F.2d 142 (CA9, 1953); Erskine Caldwell, *God's Little Acre, see Attorney General v. Book Named "God's Little Acre"*, 326 Mass. 281, 93 N.E.2d 819 (1950); Lillian Smith, *Strange Fruit, see Commonwealth v. Isenstadt*, 318 Mass. 543, 62 N.E.2d 840 (1945); D. H. Lawrence, *Lady Chatterly's Lover, see Commonwealth v. Delacey*, 271 Mass. 327, 171 N.E. 455 (1930); Theodore Dreiser, *An American Tragedy, see Commonwealth v. Friede*, 271 Mass. 318, 171 N.E. 472 (1930). *See gener-*

---

**8.** *See* Comment, *The First Amendment Exception to Copyright: A Proposed Test*, 1977 Wisc. L.Rev. 1158, 1177–78 (footnotes omitted):

> The first amendment and copyright are . . . mutually supportive. The financial incentive provided by copyright encourages the development and exchange of ideas which furthers the first amendment's purpose of promoting the "exposition of ideas." [*quoting Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031, 1035 (1942)] Of course, financial gain is only one of many reasons for creative expression; but copyright permits many authors and composers to devote their lives to creative endeavor. Without it, they would have to pursue more mundane careers in order to earn a living. While the absence of copyright would not put an end to literary and artistic endeavor, it would substantially inhibit such efforts.
>
> Furthermore, creative activity does not, in itself, result in effective expression. Modes of expression must be disseminated in order to reach an audience or readership. This requires physical effort, and investment in tangible goods and services is necessary to distribute the various forms of expression. Effective dissemination of creative work costs money.
>
> All distribution of expression would not cease in the absence of copyright. An author or other person with beneficent motives might pay for the distribution, at little or no cost to the recipient. This sort of largesse is routinely inflicted on the public during political campaigns. An author also might be able to earn some money by selling quickly before pirates could market their copies. However, the large amounts of capital presently invested in disseminating information and thought in newspapers, magazines, books, movies, and other forms of copyrightable material would flow elsewhere if there were no property right to protect the value of these investments.
>
> The Supreme Court has implied a "right to hear" in the first amendment. In essence, this is the right to reach an audience or readership. The economic basis of copyright facilitates exercise of this right by providing the financial wherewithal for its exercise.

*ally* Lewis, *Literature, Obscenity and Law* (1976); Alpert, *Judicial Censorship of Obscene Material,* 52 Harv.L.Rev. 40 (1938).

■ Further, Congress in not enacting an obscenity exception to copyrightability avoids substantial practical difficulties and delicate First Amendment issues. Since what is obscene in one local community may be non-obscene protected speech in another, see *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), and the copyright statute does not in other respects vary in its applicability from locality to locality,[9] Congress in enacting an obscenity exception would create the dilemma of choosing between using community standards that would (arguably unconstitutionally)[10] fragment the uniform national standards of the copyright system and venturing into the uncharted waters of a national obscenity standard.[11] *See* Phillips, *Copyright in Obscene Works: Some British and American Problems,* 6 Anglo-Am.L.Rev. 138, 170–71 (1977); Schneider, *supra* note 3, at 715; Comment, *Constitutional Protection of Obscene Material Against Censorship as Cor-*

related with *Copyright Protection of Obscene Material Against Infringement,* 31 S.Cal.L.Rev. 301, 306 (1958); 46 Fordham L.Rev. 1037, 1043–47 (1978). We can only conclude that we must read the facially all-inclusive 1909 copyright statute as containing no explicit or implicit bar to the copyrighting of obscene materials, and as therefore providing for the copyright of all creative works, obscene or non-obscene, that otherwise meet the requirements of the Copyright Act.[12]

## II. Constitutionality of the copyright statute

The conclusion that the 1909 Act was all-inclusive[13] and did not provide an exception for obscenity does not end our inquiry, however. We must consider whether the statute, in allowing copyright of obscene material, was constitutional and whether despite congressional intent the courts should take it upon themselves to permit the defense of obscenity in copyright infringement cases. We first turn to the question of constitutionality.

**9.** *See Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 231 n.7, 84 S.Ct. 784, 788 n.7, 11 L.Ed.2d 661, 666 n.7 (1964) (purpose of Congress is "to have national uniformity in patent and copyright laws").

**10.** *Cf. Goldstein v. California,* 412 U.S. 546, 555, 93 S.Ct. 2303, 2309, 37 L.Ed.2d 163, 173 (1973) ("The objective of the Copyright Clause was clearly to facilitate the granting of rights national in scope.").

**11.** Congress in formulating such a standard would encounter substantial difficulty. It might well be unconstitutional for Congress to allow a New York writer who is seeking copyright on a work he plans to distribute only in New York, where it is not obscene, to be denied that copyright because, judged by a national standard, the book is obscene. If, as the Supreme Court held in *Miller v. California,* 413 U.S. 15, 32, 93 S.Ct. 2607, 2619, 37 L.Ed.2d 419, 435 (1973), "It is neither realistic nor constitutionally sound to read the First Amendment as requiring that the people of Maine or Mississippi accept public depiction of conduct found tolerable in Las Vegas, or New York City," then it may conversely be argued that the First Amendment does not permit the people of New York or Las Vegas be barred from freely obtaining works acceptable to them simply because those works would be intolerable to the people of Maine or Mississippi. For, as Justice

Frankfurter said in holding that a state cannot restrict its adult population's reading material to that suitable for children, the government cannot "burn the house to roast the pig." That is, the means chosen must be reasonably restricted to the evil dealt with. *See Butler v. Michigan,* 352 U.S. 380, 383, 77 S.Ct. 524, 526, 1 L.Ed.2d 412, 414 (1957).

**12.** Of course, Congress does not approve of obscenity and has enacted several measures armed at reducing the distribution of obscene materials. *See, e. g.,* 18 U.S.C. § 1461 (crime to mail obscene materials); 18 U.S.C. § 1462 (crime to ship obscene materials interstate by common carrier); 18 U.S.C. § 1465 (crime to ship obscene materials interstate for purposes of sale or distribution). However, the existence of such statutes does not indicate that Congress intends obscene material to be uncopyrightable. Rendering obscene materials uncopyrightable would add little to the existing arsenal of weapons against pornography and would have many undesirable consequences, as discussed in the text.

**13.** The 1976 Act substitutes the equally-inclusive phrase "original works of authorship" for the phrase "all the writings of an author" in the 1909 Act. *See* 17 U.S.C. § 102 (1976, App.).

The Copyright and Patent Clause of the Constitution provides that "The Congress shall have Power . . . To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries . . ." U.S.Const. art. I, § 8, cl. 8. The district court construed this clause to limit the congressional power to grant copyrights solely to works that promote the sciences and useful arts.[14] If one carries the district court's reasoning to its necessary conclusion, Congress acted unconstitutionally in enacting an all-inclusive statute that allows copyrighting of non-useful works (such as, arguably, obscenity)[15] as well as useful works. Several lower courts and commentators have agreed with this construction of the Copyright and Patent Clause.[16] Other commentators disagree, however, and argue that Congress has power to grant copyrights even for individual works that cannot be shown to promote the useful arts so long as Congress in its exercise of its copyright power generally promotes the constitutional goal.[17] In our view the district court's reading of the Copyright and Patent Clause is unduly restrictive of Congress' power and is inconsistent with the Supreme Court's broad view of the congressional powers granted by this Clause. As one commentator has pointed out,

> The words of the copyright clause of the constitution do not require that *writings* shall promote science or useful arts: they

14. Certainly the First Amendment itself, although it permits Congress and the states to ban obscenity, does not contain an affirmative requirement that obscenity must be proscribed. "The States, of course, may follow . . . a 'laissez faire' policy and drop all controls on commercialized obscenity . . . ." *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 64, 93 S.Ct. 2628, 2639, 37 L.Ed.2d 446, 461 (1973).

15. The district court apparently was of the view that obscene materials, by definition, could not promote the sciences or useful arts, and at least one commentator agrees. *See* Rogers, *Copyright and Morals*, 18 Mich.L.Rev. 390 (1920). Under the *Miller* obscenity test, it would not necessarily be true that an obscene work is completely lacking in utility, for under that standard the work need only be shown to "lack *serious* literary, artistic, political, or scientific value." 413 U.S. at 24, 93 S.Ct. at 2615, 37 L.Ed.2d at 431 (emphasis added). However, the district court judged the movie in question obscene under both the *Miller* test and the now-obsolete *Memoirs* test. Under the *Memoirs* standard, a work may be found obscene only if "*utterly* without redeeming social value." *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts*, 383 U.S. 413, 419, 86 S.Ct. 232, 16 L.Ed.2d 1, 6 (1966) (emphasis original). Although a semantical argument can be made that a work that fails the strict *Memoirs* standard cannot possibly promote the useful arts, it is doubtful that a finding of lack of social value for obscenity purposes is equivalent to a finding of lack of utility for purposes of the Copyright and Patent Clause. In fact, if Congress deemed the creation and distribution of sexually explicit works to be beneficial, we do not doubt that this action would be permitted by the Constitution. *See*, Phillips, *Copyright in Obscene Works: Some British and American Problems*, 6 Anglo-Am.L.Rev. 138, 166 (1977).

Furthermore, it is doubtful that the question of utility is open to the court in an infringement suit, since the Supreme Court, in construing an earlier copyright statute that contained an arguably content-based restriction, held that a work's worth is sufficiently shown by an infringer's "desire to reproduce [it] without regard to the plaintiffs' rights." *Bleistein v. Donaldson Lithgraph Co.*, 188 U.S. 239, 252, 23 S.Ct. 298, 300, 47 L.Ed. 460, 462 (1903). In any event, we need not reach issues of utility because of our conclusion that the Constitution does not require that each individual work be shown to promote the useful arts in order to be copyrightable.

16. *See Barnes v. Miner*, 122 F. 480, 489–90 (C.C.S.D.N.Y.1903); *Martinetti v. Maguire*, 16 Fed.Cas. p. 920 (No. 9173) (C.C.Cal.1867); *Bullard v. Esper*, 72 F.Supp. 548 (N.D.Tex.1947); *Dane v. M. & H. Co.*, 136 U.S.P.Q. 426, 429 (N.Y.Sup.Ct.1963); 1 M. Nimmer, *On Copyright* § 1.03[B] (1978); Rogers, *supra* note 15; Note, *Obscenity and Copyright*, 6 S.Dakota L.Rev. at 111–12 (1961); Comment, *Copyright Protection of Obscene Material Against Censorship as Correlated with Copyright Protection of Obscene Material Against Infringement*, 31 S.Cal.L.Rev. 301, 306 (1958); 6 St. Mary's L.J. 274, 278 (1974); *cf. Argos Films, S.A. v. Barry International Properties Inc.*, 77 Civ. 1062 (S.D.N.Y., July 7, 1977) (constricting Copyright Act to not allow copyright of obscenity apparently adopted to avoid constitutional difficulties).

17. *See* Phillips, *supra* note 15, at 165–66; Schneider, *supra* note 3, at 698 n.36; 74 Colum. L.Rev. 1351, 1353 (1974).

require that *Congress* shall promote those ends. It could well be argued that by passing general laws to protect all works, Congress better fulfills its designated ends than it would by denying protection to all books the contents of which were open to real or imagined objection. . .

Phillips, *supra* note 15, at 165–66 (emphasis original).

■ In *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the Supreme Court addressed the scope of congressional power under the Copyright and Patent Clause. In this patent case the Court held that although Congress' power under this Clause is limited to action that promotes the useful arts, it is up to Congress to decide upon the means by which the constitutional command will best be effectuated:

> Within the limits of the constitutional grant, the Congress may, of course, implement the stated purpose of the Framers by selecting the policy which in its judgment best effectuates the constitutional aim. This is but a corollary to the grant to Congress of any Article I power. *Gibbons v. Ogden,* 9 Wheat. 1, 6 L.Ed. 23. Within the scope established by the Constitution, Congress may set out conditions and tests for patentability.

*Id.* at 6, 86 S.Ct. at 688, 15 L.Ed.2d at 550.[18] Congress has authority to make any law that is "necessary and proper" for the execution of its enumerated Article I powers, U.S.Const., art. I, § 8, cl. 18, including its copyright power, and the courts role in judging whether Congress has exceeded its Article I powers is limited. The courts will not find that Congress has exceeded its power so long as the means adopted by Congress for achieving a constitutional end

are "appropriate" and "plainly adapted" to achieving that end. *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579, 605 (1819). It is by the lenient standard of *McCulloch* that we must judge whether Congress has exceeded its constitutional powers in enacting an all-inclusive copyright statute.

Judging by this standard, it is obvious that although Congress could require that each copyrighted work be shown to promote the useful arts (as it has with patents),[19] it need not do so. As discussed in the previous section, Congress could reasonably conclude that the best way to promote creativity is not to impose any governmental restrictions on the subject matter of copyrightable works. By making this choice Congress removes the chilling effect of governmental judgments on potential authors and avoids the strong possibility that governmental officials (including judges) will err in separating the useful from the non-useful. Moreover, unlike patents, the grant of a copyright to a non-useful work impedes the progress of the sciences and the useful arts only very slightly, if at all, for the possessor of a copyright does not have any right to block further dissemination or use of the ideas contained in his works.[20] *See Baker v. Selden,* 101 U.S. 99, 25 L.Ed. 841 (1879).

■ The all-inclusive nature of the 1909 Act reflects the policy judgment that encouraging the production of wheat also requires the protection of a good deal of chaff. We cannot say this judgment was so unreasonable as to exceed congressional power. We conclude that the protection of all writings, without regard to their content, is a constitutionally permissible means of promoting science and the useful arts.

18. *See also Deepsouth Packing Co. v. Laitram Corp.,* 406 U.S. 518, 530, 92 S.Ct. 1700, 1707, 32 L.Ed.2d 273, 282 (1972) (emphasis original): "The direction of Art. I is that *Congress* shall have the power to promote the progress of science and the useful arts."

19. *See Brenner v. Manson,* 383 U.S. 519, 86 S.Ct. 1033, 16 L.Ed.2d 69 (1966).

20. This is not true in the patent area, where an inventor has the right to prevent others from using his discovery. Thus Congress and the courts have been careful to require that each patented invention advance the useful arts in some way. *See generally Brenner v. Manson,* 383 U.S. 519, 86 S.Ct. 1033, 16 L.Ed.2d 69 (1966); *Alfred Bell & Co. v. Catalda Fine Arts, Inc.,* 191 F.2d 99 (CA2, 1951).

## III. Judicially-created defenses to infringement actions involving immoral or obscene works.

Some courts have denied legal redress in infringement suits to holders of copyrights on immoral or obscene works by applying judicially-created doctrines. Two of these doctrines are largely vestiges of a bygone era and need be addressed only briefly. The theory that judges should act as conservators of the public morality was succinctly summarized by the court in *Shook v. Daly*, 49 How.Prac. 366, 368 (N.Y. Sup.Ct.1895): "The rights of the writer are secondary to the rights of the public to be protected from what is subversive of good morals." Application of this theory by the English courts in the nineteenth century led to the suppression of works because they were inconsistent with Biblical teachings or because they were seditious. *See* 46 Fordham L.Rev. 1037, 1038–39 (1978); Schneider, *supra* note 3, at 694–96. Although this theory has been relied on as recently as 1963, *see Dane v. M. & H. Co.*, 136 U.S.P.Q. 426, 429 (N.Y.Sup.Ct.1963) (common law copyright protection denied striptease because it did not "elevate, cultivate, inform, or improve the moral or intellectual natures of the audience"), it is evident to us that it is inappropriate for a court, in the absence of some guidance or authorization from the legislature, to interpose its moral views between an author and his willing audience.

A second judicially-created doctrine, the theory that a person can have no property in obscene works, merely expresses by means of a legal fiction the underlying judicial moral conclusion that the work is not worthy of protection. The doctrine has not been adopted in this country, *see* Schneider, *supra* note 3, at 696–97, and should not be. *Cf. Board of Trade v. Christie Grain & Stock Co.*, 198 U.S. 236, 251, 25 S.Ct. 637, 640, 49 L.Ed. 1031, 1039 (1905): "If, then, the plaintiffs' collection of information is otherwise entitled to protection, it does not cease to be so, even if it is information concerning illegal acts. The statistics of crime are property to the same extent as any other statistics, even if collected by a criminal who furnishes some of the data."

The third judicially created doctrine, that of unclean hands, has seldom been relied upon by courts that have denied copyright to obscene or immoral works. For the most part, only English courts have relied on this theory. *See generally* Chafee, *supra* note 3, at 1065–70. Of the various American cases allowing obscenity as a defense to a copyright infringement action, few even mention the doctrine of unclean hands. *See Bullard v. Esper*, 72 F.Supp. 548, 549 (N.D. Tex.1947) (semble); *Richardson v. Miller*, 20 Fed.Cas. 722 (No. 11,791) (C.C.D.Mass.1877). Nevertheless, since the district court permitted obscenity to be asserted as a defense through the medium of the unclean hands rubric, the concept of unclean hands requires more extended discussion.

Assuming for the moment that the equitable doctrine of unclean hands has any field of application in this case, it should not be used as a conduit for asserting obscenity as a limit upon copyright protection. Creating a defense of obscenity—in the name of unclean hands or through any other vehicle—adds a defense not authorized by Congress that may, as discussed above, actually frustrate the congressional purpose underlying an all-inclusive copyright statute. It will discourage creativity by freighting it with a requirement of judicial approval. Requiring authors of controversial, unpopular, or new material to go through judicial proceedings to validate the content of their writings is antithetical to the aim of copyrights. If the copyright holder cannot obtain financial protection for his work because of actual or possible judicial objections to the subject matter, the pro-creativity purpose of the copyright laws will be undercut.

The Supreme Court and this court have held that equitable doctrines should not be applied where their application will defeat the purpose of a statute. *See, e. g., Perma-Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 138, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982, 990 (1968) ("We have often indicated the inappropriateness of invoking broad common-law barriers to relief

where a private suit serves important public purposes."); *Woolf v. S. D. Cohn & Co.*, 515 F.2d 591, 601–02 (CA5, 1975), *vacated on other grounds*, 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1976); *accord Professional Beauty Supply, Inc. v. National Beauty Supply, Inc.*, 594 F.2d 1179, 1185 (CA8, 1979); *Simmons v. Simmons*, 57 App.D.C. 216, 19 F.2d 690 (1927); *Schnapps Shop, Inc. v. H. W. Wright & Co.*, 377 F.Supp. 570, 583–84 (D.Md.1973); Comment, *The First Amendment Exception to Copyright*: *A Proposed Test*, 1977 Wisc.L.Rev. 1158, 1170 n.101; *cf. Kiefer-Stewart Co. v. Joseph Seagram & Sons*, 340 U.S. 211, 214, 71 S.Ct. 259, 261, 95 L.Ed. 219, 224 (1951) (irrelevant in private Sherman Act suit that plaintiff had also violated Sherman Act).[21] Because the private suit of the plaintiff in a copyright infringement action furthers the congressional goal of promoting creativity, the courts should not concern themselves with the moral worth of the plaintiff.[22]

· Furthermore, the need for an additional check on obscenity is not apparent. Most if not all states have statutes regulating the dissemination of obscene materials, and there is an array of federal statutes dealing with this subject, as well. *See* note 16 *supra*. As Professor Chafee concluded, the difficulty inherent in formulating a workable obscenity defense to copyright is sufficient reason not to allow such a defense unless the other criminal and civil statutes

dealing with the obscenity problem are shown to be plainly ineffective:

> Sometimes the legislature has expressly entrusted questions of obscenity to the courts, as in criminal statutes, and then judges have to do the best they can, but the results have been quite erratic. This should be a warning against rushing into new obscenity jobs which no legislature has told them to undertake.

> The penalties for obscenity are defined by statute. Why should the courts add a new penalty out of their own heads by denying protection to a registered copyright which complies with every provision of the copyright act? . . . I think that the added penalty is justifiable only if there is a serious need for extra pressure to induce obedience to the criminal law. In the obscenity situation, this need is not obvious.

Chafee, *supra* note 3, at 1068–69.

The effectiveness of controlling obscenity by denying copyright protection is open to question. The district court thought that on the whole the long-term discouragement of the creation of obscene works would outweigh the short-term increase in the dissemination of obscene works caused by the refusal of an injunction. This theory, reached without empirical evidence or expert opinion, is at least doubtful. Many commentators disagree and are of the view that denial of injunctions against infringers

---

**21.** Although we permitted limited application of the analogous *in pari delicto* defense in a 10b–5 suit, *Kuehnert v. Texstar Corp.*, 412 F.2d 700 (CA5, 1970), we did so only because on the facts of the case it appeared unlikely that allowing the defense would frustrate the enforcement of the securities laws. On other facts we have refused to permit the defense in 10b–5 suits. *See Woolf v. S. D. Cohn & Co.*, 515 F.2d 591, 601–05. The Fourth Circuit has noted: "[I]t would appear to be more appropriate to engraft limited judicially-fashioned defenses onto judicially-implied causes of action as opposed to Congressional enactments." *Tarasi v. Pittsburgh National Bank*, 555 F.2d 1152, 1164 (CA4), *cert. denied*, 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 451 (1977); *see also Woolf v. S. D. Cohn & Co.*, 521 F.2d 225, 227 (CA5, 1975) (on petition for rehearing), *vacated on other grounds*, 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1976); note 18 *supra*. Private

actions for copyright infringement were specifically authorized by the 1909 Act. *See* 17 U.S.C. § 101 (1970) (repealed).

**22.** *Cf. Perma-Life Mufflers*, 392 U.S. at 139, 88 S.Ct. at 1984, 20 L.Ed.2d at 990:

> [T]he purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws. The plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition. A more fastidious regard for the relative moral worth of the parties would only result in seriously undermining the usefulness of the private action as a bulwark of antitrust enforcement.

of obscene materials will only increase the distribution of such works.[23] The existence of this difference of view, which we need not resolve, makes clear that the question of how to deal with the relationship between copyrights and obscenity is not best suited for case-by-case judicial resolution but is instead most appropriately resolved by legislatures. Congress has not chosen to refuse copyrights on obscene materials, and we should be cautious in overriding the legislative judgment on this issue.

Finally, permitting obscenity as a defense would introduce an unmanageable array of issues into routine copyright infringement actions. It was for this reason that the Ninth Circuit rejected the defense of fraudulent content in copyright infringement cases. *See Belcher v. Tarbox*, 486 F.2d 1087, 1088 (CA9, 1973), *accord* 2 M. Nimmer, *On Copyright* § 2.17, at 2–194. *Cf. Coca-Cola Co. v. Howard Johnson Co.*, 386 F.Supp. 330, 337 (N.D.Ga.1974) (James C. Hill, District Judge) (rejecting violation of antitrust law as defense in trademark infringement suit because it would convert courts into "a battleground for extensive antitrust litigation whenever a trademark holder seeks any, totally unrelated, equitable relief").

■ Now, we turn to examine our momentary assumption that the unclean hands doctrine can be invoked at all in this case. For reasons that we have set out, obscenity is not an appropriate defense in an infringement action, whether piggybacked on the unclean hands rubric or introduced in some other manner. But even if obscenity were not objectionable as a defense, the unclean hands doctrine could not properly be used as the vehicle for that defense.

■ The maxim of unclean hands is not applied where plaintiff's misconduct is not directly related to the merits of the controversy between the parties, but only where the wrongful acts "in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication." *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245, 54 S.Ct. 146, 148, 78 L.Ed. 293, 297 (1933). The alleged wrongdoing of the plaintiff does not bar relief unless the defendant can show that he has personally been injured by the plaintiff's conduct. *Lawler v. Gillam*, 569 F.2d 1283, 1294 (CA4, 1978). The doctrine of unclean hands "does not purport to search out or deal with the general moral attributes or standing of a litigant." *NLRB v. Fickett-Brown Mfg. Co.*, 140 F.2d 883, 884 (CA5, 1944). Here it is clear that plaintiffs' alleged wrongful conduct [24] has not changed the equitable relationship between plaintiffs and defendants and has not injured the defendants in any way.

The district court's invocation of unclean hands was based upon an ancient Fifth Circuit case, *Stone & McCarrick, Inc. v. Dugan Piano Co.*, 220 F. 837 (CA5, 1915). *Stone & McCarrick* held that a plaintiff in a copyright infringement action is barred from recovery by the doctrine of unclean hands where the copyrighted material has the effect of fraudulently deceiving or mis-

---

**23.** *See, e. g.*, Chafee, *supra* note 3, at 1069; Rogers, *supra* note 15, at 394; Phillips, *supra* note 15, at 155–56; Note, *supra* note 3, 6 S.Dakota L.Rev. at 127. *Compare Belcher v. Tarbox*, 486 F.2d 1087, 1088 n.3 (CA9, 1973), *with id.* at 1090 (Wallace, J., concurring and dissenting).

Apart from the question whether denying copyright protection to obscene works will, on balance, produce more or less creation and dissemination of obscenity, there is, of course, a separate issue of the chilling effect upon authors of new or controversial material that is within the bounds of protected speech but, in the eye of some one or more viewers, arguable obscene.

**24.** This wrongful conduct presumably is the dissemination of a sexually explicit film in a community where it is obscene. However, there is no evidence in this record that the *plaintiffs* have disseminated "Behind the Green Door" in communities where it is obscene, and we doubt that the mere act of making the movie, if attributable to the plaintiffs, injured the public. Thus, even if we accepted the use of unclean hands based upon asserted injury to the public, discussed *infra*, a remand for determination of whether the plaintiffs have been responsible for distributing the film where it is obscene would be necessary.

leading the public. Relying on trademark cases, the court concluded that in copyright cases deceit that causes injury to the public could give rise to unclean hands just as injury to the defendant gives rise to unclean hands in other equitable suits. In the present case, the court coupled this notion of "public injury" assertable as an unclean hands defense with a concept of obscenity as an injury to the public at large.

Stone & McCarrick is inconsistent with subsequent Supreme Court and Fifth Circuit cases holding, as discussed above, that an equitable doctrine should not be applied in a way that will frustrate the purpose of a federal statute. See, e. g., Perma-Life Mufflers, supra; Woolf v. S. D. Cohn & Co., supra. Stone & McCarrick does not simply apply a traditional equitable doctrine; it goes further and extends the doctrine of unclean hands to a situation not covered by the doctrine at common law and thus subverts a statutory purpose. This is plainly unacceptable under modern precedents.[25]

It is immediately apparent that limiting copyright protection on a broad public injury rationale would lead to absurd and unacceptable results. Unless the public injury rationale is limited, as it was in Morton Salt and its progeny, n.25, supra, to misuses that frustrate the particular purposes of the copyright (or trademark or patent) statute, an infringer could defend by alleging, for example, that the copyright holder has failed to pay income taxes on revenue derived from the copyright. Arguably an infringer could defend on the ground that the work had been transported into the state in the copyright owner's truck that does not meet federal safety and pollution requirements or by an interstate carrier not certificated as required by the Interstate Commerce Act. The possibilities are well nigh limitless. See generally Chafee, supra, note 3, at 1071–74. We have found no copyright, trademark, or patent case subsequent to Stone & McCarrick relying on the general principle that the rights of a holder of a

---

**25.** Moreover, subsequent Supreme Court cases have made it clear that Stone & McCarrick erroneously read prior Supreme Court precedent. Stone & McCarrick primarily relied on Manhattan Medicine Co. v. Wood, 108 U.S. 218, 2 S.Ct. 436, 27 L.Ed. 706 (1882), and read this trademark case as though its rationale was that any misuse of a government-granted monopoly (trademark, copyright, or patent) in a way that injures the public permits assertion of an unclean hands defense against the holder of the monopoly right. An independent reading of Manhattan Medicine reveals that it was not based on this broad rationale, but rather, it held that a trademark that deceives the public about the identity of the manufacturer is undeserving of judicial protection because such trademarks undermine the specific purpose of trademark protection—facilitation of public identification of manufacturers. 108 U.S. at 223, 2 S.Ct. at 439, 27 L.Ed. at 708. This rationale, rather than the broad public injury rationale perceived by Stone & McCarrick, is generally accepted in cases involving deceptive trademarks. See Chafee, supra note 3, at 1076. (For a comment pointing out Stone & McCarrick's misreading of Manhattan Medicine, see 74 Colum.L.Rev. 1351, 1355–56 (1974)). In Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942), the Court held that a patent holder's infringement action is barred by unclean hands where the patent holder is using his invention as part of a tying arrangement. The Court's rationale was much narrower than public injury as a bar. The Court denied relief because the patent holder was using his patent grant to subvert the policy of the patent law itself, extending the patent monopoly to an unpatented item by the tying arrangement. Id. at 493, 494, 62 S.Ct. at 406, 86 L.Ed. at 366, 367.

In a line of cases following Morton Salt, the Court has carefully made clear the limited nature of Morton Salt and has stressed that subversion of the policy of the patent is required. See Automatic Radio Mfg. Co. v. Hazeltine Research, 339 U.S. 827, 832, 70 S.Ct. 894, 897, 94 L.Ed. 1312, 1318 (1950) ("That which is condemned as against public policy by the 'Tie-in' cases is the extension of the monopoly of the patent to create another monopoly or restraint of competition—a restraint not countenanced by the patent grant."); Mercoid Corp. v. Minneapolis-Honeywell Regulator Co., 320 U.S. 680, 684, 64 S.Ct. 278, 280, 88 L.Ed. 396, 399 (1944) (cites Morton Salt for proposition that "respondent may not obtain from a court of equity any decree which directly or indirectly helps it to subvert the public policy which underlies the grant of its patent"); U. S. v. Univis Lens Co., 316 U.S. 241, 251, 62 S.Ct. 1088, 1094, 86 L.Ed. 1408, 1419 (1942) (states that in Morton Salt Court was "construing and applying the patent law so as to give effect to the public policy which limits the granted monopoly strictly to the terms of the statutory grant").

government-granted monopoly are limited by an infringer's right to assert as a defense any "injury" to the general public. Whatever vitality, if any, *Stone & McCarrick* presently may have, we decline to extend its holding to this case. Thus, even if we thought obscenity an appropriate defense, *Stone & McCarrick* is an inadequate justification for using unclean hands as the vehicle for allowing the obscenity defense.[26]

█ In the present case the copyright holders' actions are not inconsistent with any policy of the copyright laws. The infringers' attempt to immunize their illegal acts by wrapping themselves in the mantle of a "public injury" caused by plaintiffs is antithetical to the purpose of these laws. The effort cannot be sustained. In an appropriate case a misuse of the copyright statute that in some way subverts the purpose of the statute—the promotion of originality—might constitute a bar to judicial relief.[27] This is not such a case. The unclean hands doctrine was not applicable.

REVERSED and REMANDED.

26. We merely note another problem. Plaintiffs seek both legal and equitable relief. The doctrine of unclean hands is equitable in nature and would seemingly not bar recovery of damages for copyright infringement. *See* 74 Colum.L.Rev. 1351, 1353 (1974). There is authority, however, that in copyright and patent suits the unclean hands doctrine is applicable to both legal and equitable relief. *See* Chafee, *supra* note 3, 47 Mich.L.Rev. at 1067, 1070–71; *Tempo Music, Inc. v. Myers*, 407 F.2d 503, 507 n.8 (CA4, 1969). Since we determine that the defense of unclean hands should not be available to the defendants in this particular case, we need not resolve this issue.

27. As, for example, when the copyright is procured by making fraudulent misrepresentations about authorship to the Register of Copyrights. *See, e. g., Vogue Ring Creations, Inc. v. Hardman*, 410 F.Supp. 609 (D.R.I.1976). *See also Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 311–13 (CA1, 1966) (Lumbard, C. J., concurring), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967). It is also likely that the public monopoly extension rationale of *Morton Salt* and the other patent tie-in cases is applicable to copyright. *See U. S. v. Paramount Pictures, Inc.*, 334 U.S. 131, 157–58, 68 S.Ct. 915, 929, 92 L.Ed. 1260, 1292–93 (1948); *U. S. v. Loew's Inc.*, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962); 3 M. Nimmer, *On Copyright* § 13.09[A], at 13–95 (1978).